IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CASEY CAMPBELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:19-cv-01887-L |
| | § | |
| WILLIAM P. BARR, ATTORNEY | § | |
| GENERAL OF THE UNITED STATES; | § | |
| UNITED STATES DEPARTMENT OF | § | |
| JUSTICE; FEDERAL BUREAU of | § | |
| PRISONS; and WILLIAM ONUH, | § | |
| | § | |
| Defendants | § | |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

### Introduction

1.      Plaintiff Casey Campbell has been employed by the Federal Bureau of Prisons ("BOP") as a chaplain since 2006, serving the spiritual and religious needs of inmates, staff, volunteers and visitors at the federal prisons where he has worked.  Chaplain Campbell's job performance is routinely evaluated as excellent by his supervisors and peers.  In his current assignment at the Federal Medical Clinic Carswell ("FMC Carswell"), which began in 2008, Chaplain Campbell serves a community of prisoners, prison employees, volunteers, and visitors ministering specifically to individuals of the Protestant faith, while also working in a pluralistic, religious environment serving religious and secular needs of persons of all faiths.

2.      For many years, Chaplain Campbell and his co-workers, who are also chaplains at FMC Carswell, have been subjected to religious discrimination and harassment in a pervasively hostile work environment at FMC Carswell that is largely due to the illegal and discriminatory behavior of

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 1**

one BOP employee, William Onuh, who is also a chaplain at FMC Carswell.

3.      The religious discrimination, harassment and the hostile work environment has not been corrected by BOP, even after repeated complaints by Campbell and others over at least seven years. Due to BOP's long-term failures to remedy the illegal discrimination, Chaplain Campbell filed a complaint through the BOP's internal Equal Employment Opportunity ("EEO") process in May 2017, consistent with the requirements of Title VII applicable to his federal employment.

4.      Acting on Campbell's complaint, the Complaint Adjudication Office ("CAO") at Department of Justice ("DOJ") decided on May 16, 2019 that Campbell was a victim of religious discrimination, and entitled to compensation for that discrimination and harassment.

5.      The May 16, 2019 CAO decision is attached to this Amended Complaint and is incorporated by reference fully, as if set out in its entirety.

6.      Plaintiff offers the CAO decision as evidence[1] of the discrimination and harassment suffered by Plaintiff, as well as evidence of BOP's longstanding failure to act to remedy the illegal discrimination suffered by Plaintiff, which continues to this date.

7.      DOJ also ordered BOP to take immediate steps to remedy the harassment and to take steps reasonably calculated to prevent future harassment, consistent with 29 C.F.R. § 1614.501 (a)(2).

8.      As BOP failed to remedy the illegal religious discrimination and illegal harassment and instead, has allowed the illegal discrimination, harassment and hostile work environment to persist, Campbell files this lawsuit to pursue his claims and enforce his rights under Title VII.

9.      Campbell seeks *de novo* review of his discrimination and harassment claims by this Court,

---

[1]See *Massingill v. Nicholson*, 496 F.3d 382, 384 (5th Cir. 2007) (citing *Chandler v. Roudebush,* 425 U.S. 840 (1976) ("the Supreme Court held that administrative findings in discrimination cases may be evidence of discrimination.").

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 2**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

as allowed by Title VII.[2]

10.     Campbell timely files this Amended Complaint on March 18, 2021 in accordance with the

Court's Order on March 4, 2021 (Doc. 31).

## Parties

11.     Plaintiff, Casey Campbell, is an individual who resides in Tarrant County, Texas.

12.     Defendant, Merrick Garland ("Garland")[3], is the Attorney General of the United States, head

of the United States Department of Justice, the executive branch department under which the Federal

Bureau of Prisons runs the federal prisons.  Former Attorney General William Barr appeared in this

action on June 1, 2020.

13.     Plaintiff alleges Defendant Garland is a proper Defendant under Title VII as he is "'the head

of the department, agency, or unit, as appropriate ...'".[4]

14.     Defendant, William Onuh ("Onuh"), is employed by the Federal Bureau of Prisons at FMC

Carswell.  Defendant Onuh appeared in this action on June 22, 2020.

15.     Plaintiff alleges Defendant Onuh is a proper Defendant under the Declaratory Judgment Act

because Plaintiff seeks declarations that may affect Onuh's substantive rights.

16.     Plaintiff alleges Defendant Onuh is a proper party in this case as his actions "substantially

---

[2]The Court ordered Plaintiff to choose between a *de novo* review of the agency decision and an action to enforce the decision.  Plaintiff objects to this enforced choice because he seeks to proceed with alternative theories, but he nevertheless complies with the Court's order and he seeks *de novo* review as allowed under Title VII.  See *Massingill v. Nicholson*, 496 at 384.

[3]Plaintiff substitutes Attorney General Merrick Garland as party Defendant in place of former Attorney General William Barr, because Garland is the current holder of his office and is the necessary and proper Defendant under Title VII. See *Skoczylas v. Federal Bureau of Prisons*, 961 F.2d 543, 544 (5th Cir. 1992) (citing 42 U.S.C. § 2000e-16c).

[4]*Id.*

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 3**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

burden [Plaintiff's] exercise of religion in violation of 42 U.S.C. § 2000bb-1.

## Venue and Jurisdiction

17.     Venue is proper in the Northern District of Texas because the cause of action accrued in the Northern District of Texas.

18.     The Court has jurisdiction under 28 U.S.C. § 1331 as Campbell's claims involve questions of federal law under TITLE VII, 42 U.S.C. § 2000e *et seq.*, under the RELIGIOUS FREEDOM RESTORATION ACT, 42 U.S.C. § 2000bb *et seq.*, and claims for declaratory relief, injunctive relief and for costs and fees under 28 U.S.C. § 2201, § 2202 and § 2412.

19.     Campbell further alleges that he has exhausted all administrative requirements necessary to pursue his claims under 42 U.S.C. § 2000e *et seq.*, as he has sought EEO counseling and he has formally complained through the EEO process available at BOP and he was issued a final agency decision that allows this lawsuit and confers jurisdiction in this Court.

## Factual Allegations

20.     Casey Campbell is a chaplain at FMC Carswell institution, where he has worked since 2008.

21.     During his time as a BOP employee at FMC Carswell, Chaplain Campbell has routinely been evaluated as an exemplary employee.

22.     Starting in 2012, Chaplain Campbell has been subjected to a series of discriminatory actions while working in a long-term, pervasively hostile work environment at FMC Carswell that BOP has been aware of and failed to remedy since as early as 2013.

23.     Campbell complained to his supervisors at FMC Carswell over a period of several years, from 2013 through 2017, that he was being illegally discriminated against because of his Protestant religion by his co-worker, William Onuh, a Catholic chaplain at FMC Carswell.

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 4**

24.    Despite the repeated complaints about Defendant Onuh by Campbell and many others at FMC Carswell, including fellow chaplains, other BOP employees, volunteers, visitors, and prisoners, which extended over a period of more than four years, no one of any authority took action to prevent the illegal religious discrimination by Onuh against Chaplain Campbell and others.

25.    On May 2, 2017, after his repeated complaints over a period of years to supervisors at FMC Carswell about illegal discrimination prompted no remedial action by BOP, Casey Campbell filed a formal complaint of religious discrimination under 42 U.S.C. § 2000e (Title VII) and 29 C.F.R. 1614 to the EEO Office for BOP.

26.    Campbell complained through BOP's agency complaint process of discrimination and harassment against him due to his Protestant religion, including complaints about Defendant Onuh.

27.    Casey Campbell complained about Onuh's repeated, disparaging remarks about Protestant chaplains, Onuh's refusal to escort non-Catholic volunteers at FMC Carswell as required by his job duties, and Onuh's continuing refusals and failures to supervise non-Catholic activities at FMC Carswell, leaving non-Catholic chaplains like Chaplain Campbell with extra work.

28.    After an extensive investigation by a federal contractor, Adept Services, Inc., which was investigation 2017-BOP-0505, BOP received an investigation report on or about April 16, 2018.

29.    At some time after receipt by BOP, the investigation report was submitted to the CAO.

30.    On May 16, 2019, thirteen months after the investigation report was received at BOP, CAO issued its decision that Chaplain Campbell had been subjected to illegal discrimination, that he is entitled to compensation and that BOP was required to remedy the illegal discrimination, which decision is attached to this pleading and is incorporated by reference as if set out in full herein.

31.    BOP was ordered to take immediate steps to remedy illegal discrimination and harassment

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 5**

and to take steps reasonably calculated to prevent future harassment by Onuh.

32.    The CAO determined in its May 16, 2019 decision that Plaintiff is entitled to recovery of compensatory damages from BOP.

33.    The CAO also determined in its May 16, 2019 decision that Campbell is entitled to recover his attorney's fees from BOP.

34.    On September 27, 2019, seventeen months after the investigation report was received at BOP and four months after CAO issued its decision that Chaplain Campbell had been subjected to illegal discrimination, that Campbell was entitled to compensation, and that BOP was required to remedy the illegal discrimination, CAO issued a second decision.

35.    The second CAO decision, which is also attached to this pleading[5] and incorporated by reference as if set out in full herein, required BOP to pay compensation to Campbell, to pay attorney's fees incurred by Campbell, and to remedy the illegal discrimination.

36.    During the now more than twenty-two months since BOP was first ordered to take immediate steps to remedy the illegal religious discrimination and harassment Casey Campbell was and is subjected to at BOP, including by William Onuh, BOP continues to fail and refuse to remedy that illegal discrimination and/or harassment.

37.    BOP has also failed to take steps reasonably calculated to prevent future illegal discrimination and/or harassment.

38.    The allegations in this Third Amended Complaint are not intended as a treatise on all of the

---

[5]Plaintiff submits these CAO decisions as evidence. See *Massingill v. Nicholson*, 496 F.3d at 384 (citing *Chandler v. Roudebush*, 425 U.S. 840 (1976) ("administrative findings in discrimination cases may be evidence of discrimination.").

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 6**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

incidents of discrimination, harassment and retaliation that have continued since May 2019, but they are specific examples intended to show illegal religious discrimination at FMC Carswell that BOP was ordered to correct, but failed to correct, which is also evidence of the Defendants' knowledge.

39.     In June 2019, Plaintiff complained to Carlyn Sapla, who was the acting EEO director for BOP, that no corrective action had been taken by BOP to stop Onuh's illegal conduct.

40.     Also in June 2019, FMC Carswell associate warden Alan Cohen threatened Plaintiff and his supervisor, Chaplain Jonathan Clark, telling them to stop complaining about Onuh.

41.     Associate warden Cohen also told Plaintiff to stop reporting Chaplain Onuh's illegal discrimination and harassment or Plaintiff would be subjected to an investigation for stalking Onuh.

42.     Plaintiff considers Cohen's threat of an investigation to be illegal retaliation, as it is threatened action by the employer that is harmful to the point that it could very readily dissuade a reasonable worker from making or supporting a charge of discrimination.[6]

43.     In July 2019, Defendant Onuh arbitrarily canceled the Muslim religious service on July 19, 2019, without any consequence to Onuh.

44.     Plaintiff reported Onuh's action to supervisors, who also were notified by Campbell's co-worker, Chaplain Farid Farooqi, but Defendant BOP failed to take any action.

45.     Plaintiff reported to his supervisors Defendant Onuh's refusal to escort community volunteers from the Latter Day Saint ("LDS") faith on July 13, 2019 which resulted in the cancellation of the LDS worship service that day, but Defendant BOP again failed to take action.

46.     On August 10, 2019, LDS volunteers were, again (for the second time in a four week period), denied access to the institution at a time when Onuh was assigned to escort them.

---

[6]*Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 57 (2006).

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 7**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

47.     As Defendant Onuh refused to perform these duties, the LDS volunteers waited over 30 minutes before they left without ministering to the needs of the inmates, but Onuh again suffered no consequences for his refusal to perform these escort duties.

48.     When Defendant Onuh refused to perform escort duty, BOP failed to require him to escort volunteers, similar to BOP's repeated failures that Plaintiff complained about previously.

49.     On August 15, 2019, Plaintiff again complained of Defendant Onuh's refusal to escort LDS volunteers who visited FMC Carswell to provide for the spiritual needs of inmates of the LDS faith.

50.     Also on August 15, 2019, Onuh, unilaterally, without permission from supervisors and without any notification to supervisors, changed his work schedule, which resulted in a scheduled worship service that day for the Wiccan community being canceled.

51.     On August 21, 2019, Plaintiff emailed Heidi Kugler, Chief Chaplaincy Administrator at BOP, to notify Kugler that FMC Carswell inmates continue to miss religious services because of Defendant Onuh's behavior, including the incidents on August 10 and August 15, 2019.

52.     No change in Onuh's behavior resulted from Plaintiff's contact with Kugler.

53.     Because BOP refused to remedy this illegal religious discrimination, Plaintiff submitted another formal request for EEO counseling on August 22, 2019 to Michael A. Irizarry, the EEO counselor at FMC Carswell, complaining of the on-going hostile work environment at FMC Carswell and retaliation due to his earlier complaints.

54.     In February 2020, Defendant Onuh returned to work after an extended time away when he was out of the country.

55.     On February 18, 2020, Plaintiff reported reading two emails indicating that, shortly after returning to work from his leave, Onuh had interrupted a worship service and caused an LDS inmate

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 8**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

to miss her designated time of worship.

56.     At or about the same time, Plaintiff learned Onuh had cussed at an inmate worker assigned to the Religious Services work detail.

57.     In March 2020, as Plaintiff reviewed the scheduling of volunteers, it became apparent to Plaintiff that the supervisory chaplain, Chaplain Clark, had arranged the scheduling of volunteers so that Chaplain Onuh only works with Catholic volunteers, rather than with volunteers of other faiths, as other department chaplains are required.

58.     On March 11, 2020, when staff chaplains were bidding on new work schedules that would change the volunteers and inmates with whom they would regularly work, Chaplain Clark told Plaintiff that Clark might change the entire programming and volunteer schedule rather than requiring Chaplain Onuh to supervise and facilitate the programming of other faith groups.

59.     On March 11, 2020, Chaplain Gunn, the Life Connections Program chaplain, told Plaintiff that Chaplain Clark intended to leave her as the acting department head should he be required to be away from work.  Plaintiff was the senior staff chaplain in the department at the time.

60.     Before March 11, 2020, Plaintiff complained to Chaplain Clark about his practice of taking leave without naming any acting department head, which is contrary to the practice in every other department at FMC Carswell, and contrary to past practice in the Religious Services department.

61.     When confronted by Plaintiff, Clark said leaving no acting department head was "how he always liked to do things", which was contradicted by his statement to Chaplain Gunn noted above.

62.     Before Plaintiff's March 11, 2020 conversation with Chaplain Gunn and after the CAO's decision requiring BOP to remedy the illegal discrimination, Plaintiff had asked Chaplain Clark who would be the acting supervisor in his absence.

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 9**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

63.     Chaplain Clark told Plaintiff to consult associate warden Cohen, but Cohen had previously said he would not speak to Plaintiff without having another staff member present.

64.     In March 2020, Plaintiff also learned the EEO counselor for FMC Carswell, Michael Irizarry, has had several hours-long meetings with Defendant Onuh, apparently to discuss claims by Onuh, but Irizarry has never met with Plaintiff, nor with Chaplain Farooqi, who also filed an EEO complaint against Defendant Onuh.

65.     During the January 2020 to March 2020 time period, members of the executive staff at FMC Carswell, including the warden, associate warden Cohen and the warden's executive assistant, all appeared unannounced in classes led by Plaintiff, which had not happened before Plaintiff's recent complaints of discrimination and harassment.

66.     Associate warden Cohen, on at least two other occasions, attended other classes led by Plaintiff, which is unprecedented in Plaintiff's experience and not matched by Cohen's attending classes led by other chaplains.

67.     Chaplain Clark has also arranged for regional staff to attend a recent class led by Plaintiff, who was the only department chaplain monitored by visiting staff.

68.     On or about March 22, 2020, Chaplain Clark asked Plaintiff to report to him at the camp, rather than have Plaintiff go to his primary office.

69.     Clark first told Plaintiff they "had planning to do", but after Plaintiff spent most of the afternoon with Clark, without doing any planning, Clark explained that he wanted to be able to testify that he had worked to keep the Plaintiff and Defendant Onuh separate from one another.

70.     In late March 2020, Chaplain Clark told Plaintiff he had decided to cancel all religious programming with the exception of mandatory worship services, Threshold programming and Life

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 10**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

Connections programming, in response to Covid-19.

71.     Despite Plaintiff's vigorous opposition to this arbitrary and capricious decision in a prison where social distancing cannot be accomplished, this plan was put into effect.

72.     Within days of implementing this new plan, Chaplain Clark was making exceptions for Defendant Onuh to continue conducting "Stations of the Cross" programming and Onuh's class on Catholic sacraments.

73.     With these exceptions for Defendant Onuh's programs and classes, Onuh continued to receive, and he currently receives, more favorable treatment, apparently due to religion, while religious programming directed by Plaintiff was and is canceled.

74.     On March 25, 2020, Plaintiff also observed that the FMC Carswell staff telephone guide identifies Defendant Onuh as "Father" which is different than other chaplains and inconsistent with BOP guidance stating that all chaplains should be referred to simply as "chaplain".

75.     Chaplain Farooqi is not listed on the telephone guide as "Imam", nor "Dr.", and no other chaplain is listed as "Bro.", "Rev.", "Pastor", or "Dr.", as would be appropriate to their religious affiliations, as only Defendant Onuh is allowed the honorific designation of his religion.

76.     On April 6, 2020, Chaplain Clark was made an acting associate warden at FMC Carswell until further notice.

77.     Clark instructed Plaintiff to oversee Passover preparations via individual accommodation rather than allowing any congregate worship, which instruction for individual accommodation was to be the practice among the other religious groups.

78.     Plaintiff complained to acting Associate Warden (Chaplain) Clark that ... the nature of the prison environment does not lend itself to "social distancing" under the best of circumstances and

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 11**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

these restrictions are not the "least restrictive means" of placing a substantial burden upon the exercise of religion, and that these restrictions were not applied to Defendant Onuh who continued to lead congregate worship services.

79.     On or about April 6, 2020, Plaintiff reported these issues about the denial of congregate services to Chief Chaplaincy Administrator Kugler.

80.     On April 17, 2020, after Plaintiff reported to Chaplain Clark that he did not want to work with Chaplain Onuh without clear lines of authority, Chaplain Clark advised that Plaintiff, Chaplain Farooqi, and Defendant Onuh would be working at FMC Carswell without any designated supervisor.

81.     Clark told Plaintiff he "need[ed] to make rounds everywhere" and if Plaintiff felt a need to be separated from Defendant Onuh, Plaintiff should adjust his location to be opposite of Onuh's location, as "pastoral rounds need to be made everywhere".

82.     On April 17, 2020, Chaplain Clark advised Plaintiff that he should "avoid Onuh" when their schedules overlapped.

83.     On May 16, 2020, Plaintiff repeated his request for clear lines of authority and supervision on Sundays when all staff chaplains were scheduled to work, but acting associate warden (Chaplain) Clark was not present to supervise the department due to his change in duties.

84.     Chaplain Clark continued to refuse to delegate responsibilities or make clear work assignments in his absence.

85.     Due to the continuing refusal by Clark and BOP to address Defendant Onuh's religious discrimination and harassment, Plaintiff was forced to expend leave time on Sundays to avoid Onuh.

86.     In April and May of 2020, while acting as associate warden, Clark held no staff meetings, provided no plan for operation of the department, nor to alleviate the hostile work environment, and

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 12**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

he continued to cancel congregate services other than the services organized by Defendant Onuh.

87.     On May 30, 2020, when Plaintiff again complained to Chaplain Clark about Defendant Onuh's  continuing to conduct congregate worship services on Sundays in the various units, Clark indicated he did not believe Onuh was conducting services, but he would look into the matter.

88.     When Plaintiff questioned Clark after the next Sunday, Chaplain Clark said he had not spoken with the chaplains who worked the prior Sunday about whether or not services were being conducted.

89.     Clark called Chaplain Farooqi, who had worked the prior Sunday, to the office and Farooqi confirmed to Clark, in the presence of the Plaintiff, that Defendant Onuh was conducting services on various units on Sundays in violation of Clark's instructions.

90.     In April and May 2020, Clark continued to refuse to allow Plaintiff to conduct congregate services on the various units at FMC Carswell.

91.     Chaplain Clark consistently turned a blind eye to Defendant Onuh holding congregate services, while refusing Plaintiff and other chaplains the opportunity to lead congregate services.

92.     In May 2020, Plaintiff saw illegal religious discrimination at FMC Carswell continue unabated despite his complaints and despite the final agency decision that ordered BOP to remedy the illegal religious discrimination.

93.     By June 7, 2020, Chaplain Clark was no longer the acting associate warden for programming and he returned full-time to his duties as supervisory chaplain.

94.     On June 7, 2020, Plaintiff advised Chaplain Clark that Plaintiff had not worked a Sunday in two months, due to Plaintiff seeking to avoid working, unsupervised, with Defendant Onuh.

95.     Chaplain Clark again instructed Plaintiff to avoid being in the same area as Chaplain Onuh.

96.     On June 12, 2020, Chaplain Clark informed Plaintiff that a proposal Plaintiff had made for

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 13**

modified religious services was denied; that the regional office had been contacted; and no other institutions in the region were holding congregate services.

97.     Despite this information, Defendant Onuh continued to hold congregate services for the Catholic community that were apparently not authorized.

98.     Clark also informed Plaintiff on June 12, 2020, that he had not spoken with Defendant Onuh about Onuh holding unauthorized congregate services, but that Clark had emailed Onuh to instruct him to stop the services.

99.     On June 18, 2020, Plaintiff Campbell was notified that Defendant Onuh filed an EEO complaint of religious discrimination against Campbell.

100.    This EEO complaint by Defendant Onuh is consistent with Onuh's statement that he is "at war" with Plaintiff Campbell.

101.    On June 25, 2020, Chaplain Clark told Plaintiff that Clark had been selected Supervisor of the Year at FMC Carswell.

102.    That same day, Clark told Plaintiff that Clark planned to file his own EEO complaint against Defendant Onuh.

103.    As of July 6, 2020, Plaintiff and Defendant Onuh were still scheduled to work together unsupervised on Sundays, but Plaintiff accepted a move from working on Sundays, with an accompanying loss of pay, in order to avoid work with Onuh.

104.    On August 16, 2020, it was announced by BOP that Chaplain Clark was "Supervisor of the Year" at FMC Carswell, which award was given during a time when Clark held no departmental staff meetings; cancelled and failed to accommodate religious services; and when three of five staff chaplains filed EEO complaints of illegal religious discrimination and hostile work environments.

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 14**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

105.     Also in August 2020, Chaplain Clark named the two newest chaplains, Gunn and Montgomery, as acting supervisors in his absence, even after previously stating his supposed practice of not naming an acting supervisor in his absence.

106.     On August 17, 2020, Plaintiff received a telephone call from Chaplain Farooqi at home to ask about the Plaintiff's welfare.

107.     During the conversation, Farooqi said Defendant Onuh had been "hopping mad" at work that day because he was called by the Special Investigative Agent and interviewed about one of the religious services he arbitrarily canceled.

108.     Defendant Onuh said he "had kept Farooqi out of everything", but if he faced discipline over the events addressed in the interview, he "would not spare anyone."

109.     Also on August 17, 2020, Plaintiff learned that department heads are responsible for proposing all discipline to the warden, who decides whether proposed discipline is appropriate.

110.     With this information, Plaintiff recognized that when Chaplain Clark told Plaintiff on multiple occasions that nothing was going to happen to Defendant Onuh, it was Clark himself who was responsible for recommending discipline for Onuh, which he apparently did not recommend.

111.     On September 1, 2020, Plaintiff received an email from Chaplain Clark stating that "Chaplain Gunn will be acting for me on the above days. I will be on leave."

112.     Also around September 1, 2020, Chaplain Clark advised Plaintiff that Clark was planning to take responsibility for the Thresholds programming at FMC Carswell from Plaintiff and give it to Chaplain Montgomery.

113.     Thresholds is one of two nationwide Religious Services programs that are the official BOP re-entry/rehabilitation programs.

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 15**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

114.    Plaintiff has facilitated, supervised and/or directed the Thresholds programming at FMC Carswell for the entire time of his assignment at FMC Carswell.

115.    On September 10, 2020, Chaplain Clark told Plaintiff the BOP Central Office had announced that FMC Carswell never should have prohibited congregate religious services over the prior six months, as Plaintiff previously told Clark.

116.    On September 10, 2020, Plaintiff was also notified that he would receive a different work schedule starting in October, where Plaintiff and Defendant Onuh would change from working one out of four days together, unsupervised, to working three out of four days together.

117.    By this proposed schedule, Plaintiff would be forced to work more days with his harasser than with anyone else in the Religious Services department.

118.    Around September 29, 2020, while reviewing a BOP Program Statement "Discrimination and Retaliation Complaints Processing", Plaintiff learned the EEO officer for FMC Carswell was required to file a report with the CAO about the implementation of the final agency decision for his case which, apparently, was not done.

119.    On October 1, 2020, Plaintiff notified Chaplain Clark of prior instructions he had received from former Warden Jody Upton that Plaintiff should not report to Warden Upton, nor to the Special Investigative Agent, religious discrimination and harassment by Defendant Onuh.

120.    Plaintiff also notified Clark of threats by former associate warden Cohen to charge Plaintiff with "stalking" if he made any new complaints about Onuh's discrimination and harassment.

121.    Plaintiff also notified Clark that the change to Plaintiff's work schedule effective on October 1, 2020 was an aggravation of an already documented hostile work environment.

122.    Plaintiff also repeated his many earlier requests that Clark, as department supervisor, remedy

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 16**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

Campbell's hostile work environment as ordered by the May 2019 CAO decision.

123.    Clark never made any substantive response to Plaintiff's earlier requests for a remedy and he again made no substantive response on October 1, 2020.

124.    On December 5, 2020, a staff member at the main institution called on the radio for a chaplain, but no one responded.

125.    Defendant Onuh was working that day at the main institution, but he failed to respond.

126.    The control officer, again, broadcast over the radio for a chaplain to respond, but still Onuh failed to respond.

127.    Then the control officer called for Plaintiff Campbell specifically by name and Plaintiff responded to the control officer to say he was moving to the location of the control officer.

128.    When Plaintiff asked the control officer if Defendant Onuh had left the institution, she stated that she called for Plaintiff specifically, because "Chaplain Onuh doesn't answer his radio" and she knew that Plaintiff would respond.

129.    When Plaintiff then called Onuh by name on the radio, he finally responded.

130.    This is a long-standing problem in the Religious Services department, where Defendant Onuh simply fails to respond to general calls for "Religious Services" or for a "chaplain".

131.    In December 2020, after the contentious schedule change in October 2020, Plaintiff continued to be assigned to only the main institution at FMC Carswell on Fridays and he is assigned only at the camp on Saturdays .

132.    Defendant Onuh is supposed to be assigned to an opposite schedule, only at the camp on Fridays and only at the main institution on Saturdays.

133.    This arrangement is intended to separate Plaintiff and Defendant Onuh when no supervisor

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 17**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

is present, yet the separation punishes Plaintiff and substantially burdens Plaintiff's exercise of religion, as it restricts his ministry and his movement at FMC Carswell in violation of BOP policy.

134.    Also in December 2020, Chaplain Clark again made clear that he would not leave Plaintiff as the acting supervisor in his absence.

135.    Clark told others in the department that his refusal to assign Plaintiff as acting supervisor was due to Plaintiff's EEO activity.

136.    On January 8, 2021, Defendant Onuh made the decision to work at the main institution on Friday rather than from his assigned office at the camp.

137.    When Plaintiff complained to Chaplain Clark about the separation not being maintained, Clark told him that the separation was not something that he could enforce.

138.    On Friday, January 22, 2021, because Defendant Onuh had started working at the main institution on Fridays, Plaintiff reported to work at the camp.

139.    Chaplain Clark contacted Plaintiff by telephone to request that Plaintiff take supplies to Jewish inmates in the main institution for their Shabbat observation.

140.    Plaintiff reminded Clark of their exchange on January 8, 2021 and told him that he reported to the camp, rather than at the main institution, because of Clark's instruction that he avoid Defendant Onuh.

141.    Plaintiff and Chaplain Clark discussed the difficulties Clark has in managing Defendant Onuh; Clark continued to maintain that he has no responsibility for Onuh's religious discrimination and harassment because upper management instructed him to "manage around" Defendant Onuh.

142.    Plaintiff suggested that Chaplain Clark contact Defendant Onuh at the main institution to address the issue of Shabbat supplies.

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 18**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

143.     A few hours later, Clark called Plaintiff a second time to ask him to handle the issue of Shabbat supplies because Defendant Onuh either never responded to Clark's call or had refused the assignment.

144.     These events Plaintiff reported from June 2019 through January 2021 are consistent with Defendant Onuh's years-long history of arbitrarily canceling non-Catholic religious programs and services; refusing to perform the duty of escorting non-Catholic volunteers; interfering with Protestant programming; and continuing to announce and schedule Catholic services in the time and space assigned to Plaintiff for Protestant services, which were among the numerous actions demonstrating religious discrimination and harassment identified by the CAO in May 2019.

145.     Plaintiff alleges BOP's and/or FMC Carswell's policy of requiring him to avoid Defendant Onuh, as Clark has repeatedly instructed, is illegal discrimination, which BOP knows, because the CAO decision notified BOP in May 2019 that instructions of "just avoid Onuh"; "manage around him" and "work around Onuh" are examples of illegal discrimination and harassment.

146.     BOP simply refuses to correct what CAO called Onuh's "incorrigible" behavior.

147.     Plaintiff shows he has suffered both economic and non-economic damages due to Defendants' illegal conduct, including lost wages, denial of promotions, other lost economic benefits, including lost leave and vacation benefits; and he has suffered mental anguish and emotional distress because of BOP's refusal to comply with the law, because of BOP's refusal to correct Defendant Onuh's "incorrigible" behavior, and because of Onuh's illegal conduct that BOP has simply known about and refused to correct for years.

**Plaintiff's Title VII Claims**

148.     Plaintiff incorporates by reference and re-alleges as if stated fully here, the factual allegations set out in paragraphs 20 through 147 above and he relies upon these allegations for his claims of

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 19**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

violations of Title VII by Defendants.

149.    Campbell further alleges he was subjected to religious discrimination and harassment in his

employment with BOP, in violation of 42 U.S.C. § 2000e *et seq.*; he alleges he is a member of a

protected class; he suffered illegal discrimination and harassment because of his religion; and he

suffered damages as a result of the illegal discrimination, including

150.    Campbell alleges the conduct of BOP and its employees violates Title VII of the Civil Rights

Act of 1964, 42 U.S.C. 2000e *et seq*.

151.    Campbell exhausted administrative remedies, as evidenced by two decisions from CAO

attached to this pleading, and this Court accordingly has jurisdiction over his claims under Title VII.

152.    Campbell alleges he is entitled under Title VII, to file this action to obtain "a *de novo* review

of the disposition", that is, a *de novo* review of his Title VII complaints, including on liability and

remedies, which *de novo* review he now seeks.[7]

153.    Campbell alleges he is entitled to injunctive relief, declaratory relief, and/or equitable relief to

obtain appropriate remedies for his Title VII complaints, as such remedies are available under Title VII.

### Plaintiff's RELIGIOUS FREEDOM RESTORATION ACT Claims

154.    Plaintiff incorporates by reference and re-alleges as if stated fully here, the factual allegations

set out in paragraphs 20 through 147 above and he relies upon these allegations for his claims under

the RELIGIOUS FREEDOM RESTORATION ACT, 42 U.S.C. § 2000bb *et seq.*

155.    "The RELIGIOUS FREEDOM RESTORATION ACT OF 1993 (RFRA) prohibits the Federal

Government from imposing substantial burdens on religious exercise, absent a compelling interest

---

[7]*Massingill*, 496 F.3d at 384 (citing *Scott v. Johanns,* 409 F.3d 466 (D.C.Cir. 2005)).

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 20**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

pursued through the least restrictive means."[8]

156.    "Congress passed the Act in the wake of ... *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)".[9]

157.    The RFRA allows "persons whose religious exercise is substantially burdened by government ... to 'obtain appropriate relief against a government.'"[10]

158.    The RFRA authorizes this action against Defendant Garland in his official capacity as the head of the Department of Justice, which is the executive branch department in which BOP is one component agency, because the actions and inactions of BOP substantially burden the Plaintiff's exercise of religion in violation of this law.[11]

159.    The RFRA authorizes Plaintiff, as a person whose religious exercise has been substantially burdened, to assert a claim in a judicial proceeding and obtain appropriate relief.[12]

160.    "Appropriate relief" under the RFRA "includes claims for money damages against Government officials in their individual capacities."[13]

161.    The RFRA authorizes this action against Defendant Onuh in his official capacity because the term "'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States ...".[14]

---

[8]*FNU Tanzin, et al. v. Tanvir, et al.*, 141 S.Ct. 486, 489 (2020).

[9]*Id.*

[10]*Id.* (internal citations omitted).

[11]42 U.S.C. § 2000bb-1(c).

[12]Id.

[13]*Tanzin,* 141 S.Ct. at 489.

[14]42 U.S.C. § 2000bb-2(2).

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 21**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

162.   The RFRA authorizes this action against Defendant Onuh in his individual capacity because "'appropriate relief' includes claims for money damages against Government officials in their individual capacities."[15]

163.   The RFRA authorizes Plaintiff to challenge the failures of the BOP to stop conduct of Defendant Onuh, to stop conduct of other BOP employees, and to compel appropriate action by BOP employees to remedy the substantial burdens imposed on Plaintiff's exercise of his religion.[16]

164.   Defendant Onuh has no qualified immunity as to Plaintiff's claims for equitable relief, because qualified immunity is only a "defense to monetary damages and 'do[es] not extend to suits for injunctive relief[].'"[17]

165.   Defendant Onuh has no qualified immunity in this "rare obvious case, where the unlawfulness of [Onuh's] conduct is sufficiently clear".[18]

166.   Defendant Onuh has no qualified immunity because "[q]ualified immunity shields from liability 'all but the plainly incompetent or those who knowingly violate the law'"[19] and Onuh knowingly violated the law, while BOP allowed him to violate the law, at least since 2013.

167.   The May 16, 2019 decision from the CAO demonstrates the actual knowledge held by Defendant Onuh and BOP, as it states:

"It was not the case that Onuh merely does not like to work; [**Supervisory Chaplain**

---

[15]*Tanzin,* 141 S.Ct. at 489.

[16]5 U.S.C. § 704.

[17]*Robinson v. Hunt County, Texas*, 921 F.3d 440, 452 (5th Cir. 2019) (quoting *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 n.1 (5th Cir. 1997)).

[18]*Id.* (citing *City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019)).

[19]*Amador v. Vasquez*, No. 17-51001, p12 (5th Cir. 2020) (citing *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018); and *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 22**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

**Jonathan] Clark said 'he doesn't like to work with other faith groups.**' ROI 91. The record bars out Clark's assessment, as it does not describe Onuh's failure supervise Catholic services or escort Catholic volunteers."[20]

"Clark ... admitted that he believed Onuh acted inappropriately and with religious animus, so much so that he considered filing his own EEO claim ..."[21]

"Associate Warden Catricia Howard, on April 6, 2017, ... said that Clark had 'made her aware of the situation' and she '[r]eferred it for appropriate action.' ROI 27"[22]

"**But these efforts - and it seems only Clark made efforts - did not succeed.**"[23]

"The record does not show that managers took any additional action in light of Onuh's incorrigible behavior.  **Onuh continued to avoid escorting non-Catholic volunteers and to interfere with Protestant programming**. In March 2018 he left the main facility so that he would not have to assist a Christian Science volunteer and that same month **he announced and scheduled Catholic services in the time and space assigned to complainant**. ROI 66.  Complainant maintained that **'in the year since [his] official complaint, [he] has seen no change in Chaplain Onuh's behavior.'** ROI 66."

168.   Plaintiff alleges, as noted in his factual allegations above, despite the CAO order requiring BOP to "take steps reasonably calculated to prevent future harassment, consistent with 29 C.F.R. § 1614.501(a)(2)", which Plaintiff alleges required BOP to take "corrective, curative or preventive action ... to ensure that violations of the law similar to those found will not recur", BOP failed to take such "corrective, curative or preventive action".

169.   Knowing, intentional and deliberate illegal conduct of Defendant Onuh continues to this day, including much of the same illegal conduct Plaintiff has been complaining about since 2013, such as:

a.     Onuh's refusal to perform the duty of "escorting non-Catholic volunteers";

---

[20]May 16, 2019 Department of Justice Final Agency Decision in the Matter of Casey Campbell v. Federal Bureau of Prisons, P20 (emphasis added).

[21]Id. at P22.

[22]Id. at P23.

[23]Id. (emphasis added).

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 23**

      b.      Onuh continuing "to interfere with Protestant programming"; and

      c.      Onuh continuing to announce[] and schedule[] Catholic services in the time and space assigned to [Plaintiff].

170.    This present and continuing illegal conduct by Defendant Onuh is permitted and fostered by BOP, which has failed and refused to comply with the CAO decision that requires BOP to take "corrective, curative or preventive action ... to ensure that violations of the law similar to those found will not recur".

171.    These failures by BOP to comply with the final agency decision from the CAO are evidence to demonstrate the need for injunctive relief as "appropriate relief" under the RFRA.

172.    Plaintiff alleges he is entitled to injunctive relief, declaratory relief, and/or other equitable relief to end the substantial burdens imposed on his exercise of his religion, which substantial burdens are the results of the illegal conduct by Defendant Onuh that is allowed by BOP.

173.    The Court should craft appropriate legal, injunctive, declaratory, and/or other equitable relief to compel BOP to take necessary "corrective, curative or preventive action ... to relieve Plaintiff of the substantial burdens imposed on his exercise of religion that are imposed by the illegal conduct by Defendant Onuh; by the failures of BOP to comply with its obligations under Title VII; and failures by Defendant Garland to ensure his subordinates and subordinate agencies follow the law.

**Plaintiff's Claims for Declaratory, Injunctive and Equitable Relief**

174.    Plaintiff alleges the Court has authority under 42 U.S.C. § 2000bb *et seq.*; under 28 U.S.C. § 2201 and § 2202; and/or under 42 U.S.C. § 2000e-5(g) to order declaratory, injunctive, and/or other equitable relief, including authority to decide Plaintiff's right to remedies from BOP, whether this Court acts under the RFRA and/or this Court completes a *de novo* review of Plaintiff's claims

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 24**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd

under Title VII.

175.    Plaintiff shows the Court has authority to determine necessary steps to be taken by BOP to remedy the harassment and to determine what steps should be taken by BOP that would be reasonably calculated to prevent future harassment, consistent with 29 C.F.R. § 1614.501 (a)(2).

176.    As Defendant Onuh is an individual who will be affected by Campbell's requests for declaratory, injunctive, and equitable relief, Campbell also shows the Court that Defendant Onuh is a proper party to this action that may determine legal rights and remedies that affect Onuh.

177.    Plaintiff shows the Declaratory Judgment Act was "expressly designed to provide a milder alternative to the injunction remedy."[24]

178.    Plaintiff alleges he "may pursue both injunctive and declaratory relief, and '[a] court may grant declaratory relief even though it chooses not to issue an injunction or mandamus.'"[25]

### Plaintiff's Damages

179.    Defendants caused Plaintiff to suffer damages, including past economic damages and past and future mental anguish and emotional distress, for which Plaintiff seeks monetary relief, including all lost wages, lost leave time, lost vacation time and/or other damages for the mental anguish and emotion distress that Plaintiff has suffered.

### Pre-Judgment and Post Judgment Interest

180.    Plaintiff seeks pre-judgment and post judgment interest as allowed by applicable law.

### Attorney's Fees

181.    Plaintiff Casey Campbell seeks attorney's fees as permitted by law, including under 28

---

[24]*Robinson v. Hunt County, Texas*, 921 F.3d 440, 450 (5th Cir. 2019) (citing *Morrow v. Harwell* , 768 F.2d 619, 627 (5th Cir. 1985)).

[25]*Id.* (citing *Powell v. McCormack*, 395 U.S. 486, 499 (1969)).

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 25**

U.S.C. § 2201 *et seq.*; under 42 U.S.C. § 2000bb *et seq.*; and/or under 42 U.S.C. § 2000e *et seq.*

### Jury Request

182.    Casey Campbell requests a jury trial.


WHEREFORE, Plaintiff Casey Campbell prays that after Defendant Merrick Garland and Defendant William Onuh answer, that on final jury trial, he have judgment against Defendants for his damages, costs of suit, prejudgment and post-judgment interest as permitted by law, as well as the declaratory, injunctive and equitable relief requested against both Defendants, and for all other relief to which Plaintiff may show himself to be justly entitled.

Respectfully submitted,

 *s/ William J. Dunleavy*

William J. Dunleavy
State Bar No. 00787404
Law Offices of William J. Dunleavy
825 Watters Creek Boulevard
Building M, Suite 250
Allen, Texas  75013
Telephone: 972/247-9200
Facsimile: 972/247-9201

ATTORNEY FOR PLAINTIFF

### CERTIFICATE OF FILING AND SERVICE

I certify that on March 18, 2021, I electronically filed this pleading with the Clerk of the U.S. District Court Northern District of Texas, using the electronic case filing system.  The electronic case filing system sent "Notice of Electronic Filing" to Sarah E. Delaney: sarah.delaney@usdoj.gov; Andrew Pritchard: andrew.pritchard@usdoj.gov; Brian Stolz: brian.stoltz@usdoj.gov; and Scott Hogan: scott.hogan@usdoj.gov, as attorneys of record for Defendant Garland and Defendant Onuh, who have consented to accept this service of pleadings by electronic means.

 *s/ William J. Dunleavy*

William J. Dunleavy

**PLAINTIFF'S THIRD AMENDED COMPLAINT - Page 26**

CAMPBELLAMENDEDCOMPLAINT3final03182021.wpd



**U.S. Department of Justice**
Complaint Adjudication Office

Agency No. BOP-2017-0031
DJ No.      187-3-4582

950 Pennsylvania Ave NW
Patrick Henry Building, Room A4810
Washington, DC 20530

Mr. Casey Campbell
13109 Berrywood Trail
Fort Worth, Texas 76244

**MAY 1 6 2019**

Dear Mr. Campbell:

This is in reference to the discrimination complaint that you filed against the Federal Bureau of Prisons. Under the federal equal employment opportunity regulations, the Complaint Adjudication Officer renders the final Department of Justice decision on your complaint. Enclosed is the final Department of Justice decision which concludes that the record supports a claim of discrimination based on religion.

<u>Rights of Appeal</u>

Even with a decision in your favor, you may still wish to file an appeal to contest some aspect of this final decision. You have two alternatives for appeal. First, you have the right to appeal any part of the decision to the Equal Employment Opportunity Commission (EEOC). You may do so by filing your appeal within 30 days of the date you receive this decision. If you are represented by an attorney of record, the 30-day appeal period shall begin to run the day your attorney receives this decision. The appeal must be in writing. The EEOC prefers that you use EEOC Form 573, Notice of Appeal/Petition to file an appeal; a copy of Form 573 is attached to this letter. The Notice of Appeal should be sent to Carlton Hadden, Director, EEOC, Office of Federal Operations. You may send the appeal to Director Hadden by mail at P.O. Box 77960, Washington, D.C. 20013, by facsimile at 202-663-7022 (must be no longer than 10 pages), or you can hand-deliver it at 131 M Street N.E., Washington, D.C. 20507. You must also send a copy of your notice of appeal to Carolyn Sapla, EEO Officer, Federal Bureau of Prisons, 320 First St. NW, Rom 936, Washington, DC, 20013. Either on, or attached to, the Notice of Appeal that you send to Director Hadden, you must state the date and method by which you sent the copy of your notice of appeal to Ms. Sapla.

Second, you have the right to file a civil action in the appropriate United States District Court within 90 days of the

date you receive this decision. In filing your federal complaint you should name William P. Barr, Attorney General, as the defendant. Even if you appeal this decision to the EEOC, you still have the right to go to federal court: you may file a civil action in United States District Court within 90 days of the day you receive the EEOC's final decision on your appeal, or after 180 days from the date you filed your appeal with the EEOC, if the EEOC has not decided the appeal by then.

If you cannot afford to file a civil action, you can ask the court to allow you to file the action at no cost to you: The court may also provide you with an attorney if you cannot afford to hire one to represent you in your civil action. Questions concerning when and how to file a waiver of costs should be directed to your attorney or the District Court clerk.

Sincerely,

Robert K. Abraham
Acting Complaint Adjudication Officer


cc: Carolyn Sapla
    Richard Toscano

2

*The U.S. Equal Employment Opportunity Commission*

## NOTICE OF APPEAL/PETITION
## TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

OFFICE OF FEDERAL OPERATIONS
P.O. Box 77960
Washington, DC 20013

**Complainant Information:** (Please Print or Type)

| | |
|---|---|
| Complainant's name (Last, First, M.I.): | |
| Home/mailing address: | |
| City, State, ZIP Code: | |
| Daytime Telephone # (with area code): | |
| E-mail address (if any): | |

**Attorney/Representative Information (if any):**

| | |
|---|---|
| Attorney name: | |
| Non-Attorney Representative name: | |
| Address: | |
| City, State, ZIP Code: | |
| Telephone number (if applicable): | |
| E-mail address (if any): | |

**General Information:**

| | |
|---|---|
| Name of the agency being charged with discrimination: | |
| Identify the Agency's complaint number: | |
| Location of the duty station or local facility in which the complaint arose: | |
| Has a **final action** been taken by the agency, an Arbitrator, FLRA, or MSPB on this complaint? | ___Yes; Date Received _____ (Remember to attach a copy)<br>___No<br>___This appeal alleges a breach of settlement agreement |
| Has a complaint been filed on this same matter with the EEOC, another agency, or through any other administrative or collective bargaining procedures? | ___No<br>___Yes (Indicate the agency or procedure, complaint/docket number, and attach a copy, if appropriate) |
| Has a civil action (lawsuit) been filed in connection with this complaint? | ___No<br>___Yes **(Attach a copy of the civil action filed)** |

**NOTICE:** Please **attach a copy of the final decision or order** from which you are appealing. If a hearing was requested, please attach a copy of the agency's final order and a copy of the EEOC Administrative Judge's decision. Any comments or brief in support of this appeal MUST be filed with the EEOC **and** with the agency **within 30 days** of the date this appeal is filed. The date the appeal is filed is the date on which it is postmarked, hand delivered, or faxed to the EEOC at the address above.

| Signature of complainant or complainant's representative: | |
|---|---|
| Date: | |

**EEOC Form 573 REV 1/01**

## PRIVACY ACT STATEMENT

(This form is covered by the Privacy Act of 1974, Public Law 93-597. Authority for requesting the personal data and the use thereof are given below.)

1. **FORM NUMBER/TITLE/DATE:** EEOC Form 573, Notice of Appeal/Petition, January 2001

2. **AUTHORITY:** 42 U.S.C. § 2000e-16

3. **PRINCIPAL PURPOSE:** The purpose of this questionnaire is to solicit information to enable the Commission to properly and efficiently adjudicate appeals filed by Federal employees, former Federal employees, and applicants for Federal employment.

4. **ROUTINE USES:** Information provided on this form will be used by Commission employees to determine: (a) the appropriate agency from which to request relevant files; (b) whether the appeal is timely; (c) whether the Commission has jurisdiction over the issue(s) raised in the appeal, and (d) generally, to assist the Commission in properly processing and deciding appeals. Decisions of the Commission are final administrative decisions, and, as such, are available to the public under the provisions of the Freedom of Information Act. Some information may also be used in depersonalized form as a data base for statistical purposes.

5. **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION:** Since your appeal is a voluntary action, you are not required to provide any personal information in connection with it. However, failure to supply the Commission with the requested information could hinder timely processing of your case, or even result in the rejection or dismissal of your appeal.

Send your appeal to:

The Equal Employment Opportunity Commission
Office of Federal Operations
P.O. Box 77960
Washington, D.C. 20013

*This page was last modified on January 9, 2009.*



**U.S. Department of Justice**
Complaint Adjudication Office

Agency No: BOP-2017-0031
DJ No.    187-3-4582

950 Pennsylvania Avenue NW
Patrick Henry Building, Room A4810
Washington, DC 20530

DEPARTMENT OF JUSTICE FINAL AGENCY DECISION

in the matter of

MAY 1 6 2019

Casey Campbell v. Federal Bureau of Prisons

Complainant, Casey Campbell, works as a chaplain at the Federal Bureau of Prisons' (BOP's) Carswell, Texas institution. He filed an employment discrimination complaint against the BOP under Section 717 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16 (Title VII) and 29 C.F.R. 1614.101(a).

The issue here is whether BOP discriminated against complainant because of his Protestant religion when a Catholic chaplain made disparaging remarks about Protestant chaplains, refused to escort non-Catholic volunteers, and failed to supervise non-Catholic activities, leaving non-Catholic chaplains like complainant with extra work.  ROI 44.

Facts

I.    Complainant's Allegation

Complainant, a Baptist prison chaplain, claims that a Catholic chaplain, William Onuh, routinely harassed him and other Protestant chaplains.  ROI 56.  Onuh made scornful comments to complainant and to inmates, yelled at complainant, interfered with his work, and refused to serve non-Catholic inmates and volunteers — leaving complainant and other chaplains to pick up the slack.  Complainant claims Onuh "had a pattern of behavior that is prejudiced against non-Catholics over the entire course of his tenure at FMC Carswell."  ROI 58.[1]

A.    Onuh's Harassment of Complainant

From early in their working relationship, complainant maintained, he was unable to "spend more than an hour with

---

[1]  Onuh has worked at Carswell since 2012.  ROI 83.

Chaplain Onuh without him becoming bellicose and yelling at
[complainant] or someone else." ROI 129. Complainant
repeatedly complained to managers about scheduling conflicts
between himself and Onuh, problems with shared office space, and
"unprofessional conduct." ROI 132-134. He admitted he did not
"like, trust, or appreciate Chaplain Onuh," who he described as
"both irrational and emotionally unstable." ROI 130, 123. In
2013, complainant suggested separate office space might help,
but management did not provide it. ROI 127. Soon afterwards,
complainant moved out of a shared office with Onuh and began to
use a former storage closet for his belongings. ROI 129.

"[O]n a couple of occasions," complainant said, Onuh told
him "that white evangelicals and Republicans are ruining the
country." ROI 59. In 2013, Onuh "belitt[ed] and berat[ed]"
another Protestant chaplain, Chaplain Stephens, "to the point of
tears for several weekends in a row." ROI 127.[2]

Complainant's problems with Onuh continued into 2014. In
June 2014 he and Onuh got into a heated email exchange after
Campbell declined to take a phone call about a death
notification and asked the front desk officer to ask Onuh to do
it. ROI 138. Also that month, complainant emailed a Human
Resources Manager reporting that Onuh "becomes belligerent
whenever he is asked to do anything that does not directly
involve Roman Catholics." ROI 132, 139. He wrote a Catholic
Bishop, too, to complain that Onuh "argues with everything and
everyone" so that "staff meetings are almost unbearable when he
is present." ROI 136. Complainant even considered transferring
to another institution, he said, but could not "financially
afford to do so." ROI 135.

Onuh's harassment continued, and in recent years Onuh made
disparaging comments about complainant and Supervisory Chaplain
Jonathan Clark. He has called the Protestant chaplains "boys"
and has told complainant he was "worthless." ROI 59. In 2017,
Onuh told inmates in his congregation that the Catholic
congregation was "under attack & being persecuted." ROI 58, 61,
146-148, 151-153. He said Protestant services were "just
entertainment." ROI 59.

---

[2]   Stephens' first name is not in the record.

In complainant's view, and as a result of Onuh's actions and behavior, his "faith [was] ridiculed by a fellow employee in a public setting." ROI 61. Furthermore, the remarks "put the safety and security of [the] institution's staff at risk (by inciting the inmates against [Onuh's] fellow chaplains)." Complainant's May 12, 2018 Statement to the Complaint Adjudication Office at 8-9.

B.   Onuh's Refusal to Serve Non-Catholic Volunteers and Inmates

In addition to contemptuous comments, complainant claims, Onuh routinely refused to escort and supervise non-Catholic volunteer groups, leaving other chaplains to fill in for him. ROI 60, 156. Chaplains must "share pastoral duties, supervision of inmate groups, and administrative functions," according to complainant. ROI 61. This includes recruiting, training, and supervising volunteers of other faiths. ROI 61. Indeed, the chaplain's job description stipulates that they "[p]rovide a full pastoral ministry to inmates of all faith groups." ROI 121. Normally, as complainant described it, volunteers coming in to lead religious activities report to the front lobby and a chaplain takes them inside. ROI 59. This is "one of the most basic duties for any chaplain," complainant said. ROI 59. But Onuh, complainant reported, has "stated that he is a 'Catholic chaplain'" as a way of explaining his unwillingness to assist certain volunteers. ROI 61.

Onuh failed to escort non-Catholic volunteers even when managers had assigned him to oversee an event with the volunteers, complainant asserted. ROI 156. Managers have, at times, instructed complainant to alter his activity schedule to transport volunteers that Onuh refused to serve. ROI 60. As complainant sees it, he "is being discriminated against when [he is] expected to escort and supervise volunteers as part of the conditions of [his] employment" and Onuh "is allowed to choose when and whether he will perform those same duties." ROI 61.

In early February 2017, a Seventh Day Adventist volunteer and a Mormon volunteer came to the prison and waited to meet with a women's group, but could not do so because they had no

3

escort.  ROI 58, 144.[3]  Even though he was the only chaplain on
duty, Onuh refused to escort the volunteers.  ROI 27.  In the
meantime, the inmates had gathered for the planned meeting at
the appointed time only to find the religious services
department closed.  ROI 149.  "This has occurred now on several
occasions," an inmate recounted in filing a complaint, and "[i]t
is always when Chaplain Onuh is left to run the [Religious
Services] Dep[artment]."  ROI 149.  Onuh "disregards all other
services and is only concerned with his (catholic)," the inmate
said, and she and "others find it discriminating."  ROI 149.

     On March 9, 2017, Onuh again refused to escort non-Catholic
volunteers.  This time Chaplain Beverly Ford stayed beyond her
scheduled shift, working overtime, to accommodate a Protestant
activity managers had assigned Onuh to facilitate.  ROI 27, 58.

     For some 18 weeks starting August 17, 2017, complainant
reported, Mentor Coordinator Kathy Mobley "had to adjust her
work routine" to support a recurring Thursday morning Protestant
activity.  ROI 119.  Onuh was assigned to oversee the event, but
he "either d[idn't] show up, or fail[ed]/refuse[d] to supervise
the program."  ROI 119.  Accordingly, Mobley covered for Onuh on
all but two Thursdays.  ROI 119.

     According to complainant, Onuh "has only ever refused to
escort non-Catholic volunteers."  Complainant's May 12, 2018
Statement to the Complaint Adjudication Office at 6.  When Onuh
does escort non-Catholics, complainant maintained, he treats
them rudely and arrives late.  ROI 30.  In response volunteers
"regularly express their frustrations," complainant reported,

---

[3]  Complainant reported that Onuh refused to escort a Mormon and
a Seventh Day Adventist volunteer on February 9.  ROI 30, 58.
An unidentified volunteer emailed the prison reporting that the
sender and a Seventh Day Adventist volunteer were turned away on
February 4.  ROI 144.  An inmate similarly complained that on
February 4 Onuh failed to open Religious Services for the
Seventh Day Adventist group to meet with volunteers.  ROI 149.
Given the similar descriptions of the event, it seems likely
that these sources describe the same incident and complainant
may be mistaken on the exact date.

with Onuh's "demeanor/attitude toward them." ROI 30.[4]
Complainant also said that the February and March 2017 incidents
were "not the only times [Onuh] has refused or threatened to
refuse to escort non-Catholic volunteers." ROI 59.
Furthermore, because Onuh "could not be relied upon to provide
the community with the elements necessary for their service on a
consistent and timely manner," complainant explained, the prison
had to change the schedule for Native American worship. ROI 58.

As late as March 2018, Onuh left the main facility and went
to the prison camp, complainant asserts, so that he would not
have to escort a Christian Science volunteer. ROI 66. Instead,
complainant assisted the volunteer. ROI 66. Also that month,
after BOP assigned Onuh a shift overlapping with two other staff
members, staff conferred and decided to be "especially careful
to escort the volunteers every week in order to save them from
having to interact with Chaplain Onuh." ROI 67. As complainant
sees it, "his behavior has gone on for so long, that many people
don't even realize how many changes have to be made in order to
accommodate him." ROI 67.

Onuh also went out of his way, complainant believes, to
interrupt a Protestant service in March 2018. ROI 66. Onuh has
announced and scheduled Catholic services to take place in the
space complainant had previously reserved for Protestant
services. ROI 66, see also ROI 147-148.

In complainant's estimation these incidents show that Onuh
"is prejudiced against non-Catholics." ROI 58. Indeed, Onuh
has stated "that he is a 'Catholic chaplain' giving clear
indication that he believed that he was not an ordinary chaplain
and subject to sharing all of the ordinary chaplain tasks." ROI
61.

C.   Complainant's Reports to Managers

Complainant said that he has repeatedly spoken to managers
about his problems with Onuh. Years before filing his EEO

---

[4] The investigator requested a list of the volunteers chaplains
escorted between February 5 and March 9, 2017, but BOP did not
provide this information. ROI 54.

complaint, complainant spoke to former Supervisory Chaplain
Robert Danage "on several occasions" reporting Onuh's refusal to
serve non-Catholics. ROI 62; see also ROI 16.[5] He told Danage
that he, "as a Protestant . . . was being asked to do more than
Chaplain Onuh." ROI 62. Indeed, complainant said, Onuh told
Danage in a staff meeting in front of everyone that he "'would
not' escort and supervise the groups he had been assigned."
Complainant also relayed Onuh's comments that "white
evangelicals were ruining the country." ROI 61. In response,
Danage told complainant to "let it go." ROI 61. He explained
that "Catholic priests have 'a lot of pull'" and he was
unwilling to try to correct Onuh's behavior. ROI 62. Danage
also said that he "was afraid of having an EEO claim made
against him if he tried to make Chaplain Onuh perform his duties
like any other chaplain," complainant reported. ROI 62.
Complainant in turn asked Danage "why he wasn't afraid that
[complainant] would file an EEO complaint." ROI 62. Danage
told complainant that executive staff had instructed him to
"'manage around' Mr. Onah." ROI 66.

Complainant also reported problems to Associate Warden
Schuman and Warden Jody Upton in 2013. ROI 127-129.[6]
Complainant said he told the Warden he wanted to file an EEO
complaint, but worried "the process would be too long." ROI 62.
The Warden told complainant to "just overlook Chaplain Onuh's
attitude, comments, and behavior," complainant reported. ROI
61. In response to complainant's concerns, the Associate Warden
suggested that complainant "use [his] pastoral skill to reason
with" Onuh and defuse tensions. ROI 127. Managers generally
advised complainant to "ignore" Onuh. ROI 62.

Complainant claimed then Associate Warden Schuman refused
to intervene in another chaplain's struggles with Onuh. When
"it came to light" that Onuh harassed Chaplain Stephens "to the
point of tears for several weekends in a row," Schuman told her
to "be more assertive." ROI 127. In the Associate Warden's

---

[5] Complainant did not remember when this occurred. However,
Clark has been Supervisory Chaplain since April 2015, so it is
likely that the exchange occurred before then. ROI 88.

[6] Associate Warden Schuman's first name is not in the record.

opinion, complainant and Stephens "were equally responsible for
the conflict and problems that [they] had been experiencing with
Chaplain Onuh." ROI 132.

In 2014 complainant wrote to Jonna Hawk, the Human
Resources Manager, to report Onuh's reluctance to serve non-
Catholics. He claimed that managers dealt with Onuh by simply
not asking him "to perform the routine duties that the rest of
us are asked to perform." ROI 132, 139. Complainant requested
that he not work alone with Onuh. ROI 132. He also told Hawk
he had stopped reporting his concerns to managers because "the
administration was not going to take [his] concerns seriously."
ROI 132.

Based on these interactions, complainant characterized BOP
managers' response as "inaction over the years." ROI 66. As
complainant sees it, in the year since his 2017 EEO complaint he
has "seen no change in Chaplain Onuh's behavior toward [him] or
the programs [complainant] facilitate[s] and provide[s]." ROI
66. Complainant reports that Onuh "continues to make snide,
sarcastic, and/or disparaging remarks about [complainant and
Clark] to the inmate population." ROI 66. He assumes no
"effective training or discipline has taken place." ROI 66.

II.  Witness Testimony

   A.  Chaplain William Onuh

Onuh maintains that he has never "said or written anything
negative about [complainant]." ROI 83. According to Onuh, he
and complainant do not get along; complainant "resents [Onuh's]
presence and would not like to have [him] around," Onuh
believes. ROI 85. He claims complainant "has written [Onuh] up
several times," and once packed up his belongings while Onuh was
on vacation. ROI 85.

Onuh complained of a "chaotic period Chaplains Clark and
[complainant] created," causing scheduling mishaps. ROI 83.
One day during this time, Onuh said, a volunteer arrived and
none of the chaplains had advance notice. Onuh was busy in the
chapel, and another chaplain escorted them after calling Clark
at home to verify the visitors. ROI 83. Onuh reported he "was

written up for this incident" and received a "reprimand."  ROI
83.  He has never made pejorative comments about Protestant
chaplains or refused to escort non-Catholic volunteers, Onuh
insists.  ROI 84.

  B.  Supervisory Chaplain Jonathan Clark

      Clark, complainant's supervisor since 2015, reported that
inmates came to him with concerns about Onuh's comments about
other chaplains.  ROI 89.  Inmates said Onuh called Protestant
Chaplains "liars" and "boys."  ROI 89.  In an email to Clark on
February 8, 2017, one inmate reported that, at mass, Onuh "took
the opportunity to bad mouth [Clark], [complainant], and
Religious Services" and "[t]his was basically the theme of the
entire Mass."  ROI 143.

      Another inmate, in a February 6, 2017, letter to Clark,
said that Onuh announced at mass "that the Catholic community
was under attack & being persecuted."  ROI 146.  In the homily
that day, the inmate reported, Onuh said that the Religious
Services Administration "plotted and schemed to undermine him"
and that officials were "jealous" of high attendance at Catholic
services.  ROI 146.  Onuh vowed to "stand his ground" on keeping
an 8:00 a.m. Sunday slot for mass "as long as he is the Catholic
Chaplain."  ROI 147.  Although mass was scheduled for 1:45 p.m.
the next Sunday, Onuh said that inmates should ignore bulletins
or announcements and come at 8:00.  ROI 148.  He reminded them
that "the community was under persecution," and that they needed
to "stand together."  ROI 148.  The effect, the prisoner said,
was to "g[e]t a few inmates riled up."  ROI 148.

      On February 19, Onuh gave a second disruptive sermon,
claiming again that the Catholic community was "under attack"
and accusing Religious Services of "tell[ing] [inmates] lies,"
including "lies" about Onuh.  ROI 151-153.  He asserted that the
"Protestant chaplains" should take over duties at the outlying
facility, the prison camp, where he apparently preferred not to
work.  ROI 154.  Onuh suggested that a time change in scheduled
services that the other chaplains had imposed could undermine
attendance at Catholic services.  ROI 154.  Onuh also denounced
Nell Blackerby, a Catholic contractor in Religious Services,
accusing Blackerby and Clark of "[going] to the Bishop" about

him, and declaring that "the Bishop here has no control over [him.]" ROI 152. In addition, Onuh told inmates he had no duty to supervise volunteers, and that BOP should not "spend money on foolishness" like the volunteer program. ROI 154. Clark said he informed BOP leadership about the inmate complaints. ROI 91.

After Onuh refused to escort non-Catholic volunteers, Clark "had several conversations" with him about it and "issued verbal reprimands." ROI 90. Indeed, he went so far as to refer Onuh to Special Investigative Services for misconduct. ROI 90.[7] On March 15, 2017, Clark wrote Warden Upton to report Onuh for failing to follow his instructions and escort volunteers on March 10, leaving Ford to pick up the slack. ROI 159. In the memo, Clark did not detail Onuh's pattern of refusing to escort non-Catholic volunteers. ROI 160.

Clark acknowledged that all chaplains are responsible for escorting volunteers for religious services. ROI 90. Chaplains are each "endorsed by their own religious traditions," he explained, but must also "facilitate inmates of all religious faiths [with] opportunities to pursue individual religious beliefs and practices." ROI 91.

After complainant told Clark about harassment, Clark informed complainant that he could seek help from the Employee Assistance Program or talk to an EEO counselor. ROI 91. He assured complainant that he "was addressing the concern of volunteers not being escorted." ROI 91. When an EEO counselor spoke to Clark on March 28, 2017, Clark said he knew about the issues with Onuh and had explained the problems to his supervisor. ROI 27. In his interview with the investigator, Clark reiterated that he had "voiced [complainant's] concerns to the Executive Staff." ROI 91.

In Clark's view, Onuh subjected complainant to discrimination based on his faith, and he discriminated against others as well. ROI 91. Onuh and complainant have a "strained" working relationship, as Clark describes it, and in Clark's view "Onuh sees workplace relationships as Protestants vers[u]s

---

[7] Clark did not specify when he referred Onuh for investigation. ROI 90.

Catholics." ROI 91. Clark attributed this "to [Onuh's] own religious perspective" — he "is difficult to work with because he doesn't like to work with other faith groups." ROI 91. Clark affirmed that another Protestant chaplain, Ford, has been asked to work overtime because Onuh refused to escort Protestant volunteers. ROI 90.

Clark himself "would have filed an EEO complaint much the same as [complainant's]," he said, and he "may still" do so. ROI 92. But because Onuh has filed so many grievances against Clark, he worries any complaint would be seen as retaliation. ROI 92.

### C.   Associate Warden Catricia Howard

Howard is Clark's supervisor and complainant's second-line supervisor. She reported that Clark emailed her on March 16, 2017, about "an allegation of prejudice and harassment [involving] Chaplain Onuh." ROI 75-76. The email described "pejorative comments" that Onuh allegedly made about Protestant chaplains and claims that Onuh refused to escort non-Catholic volunteers, Howard said. ROI 76, 80.

Howard provided the email she described to the investigator, and in it complainant asked "to make a formal complaint about the long standing prejudice and harassment" from Onuh, including "negative comments" about complainant, assertions that his services are "mere entertainment," and refusal to perform chaplain duties for non-Catholics. ROI 80. According to complainant, all this had created an "atmosphere of anxiety" in the department. ROI 80.

In response to the email, Howard said, Clark "was advised to speak to Chaplain Onuh about the allegations." ROI 78. Howard assured the EEO counselor on April 6, 2017, that she had "referred" complainant's concerns "for appropriate action" but provided no further elaboration. ROI 27. She did not believe Onuh had subjected complainant to discrimination. ROI 78.

In describing the chaplains' duties to the investigator, Howard explained that chaplains at the prison "are responsible for the supervision and administration of all religious programs

10

as well as other religious activities." Each should "provide full pastoral ministry to inmates of all faith groups." ROI 78.

### D.    Warden Jody Upton

Upton, Warden since 2013, described "being sent an email" from complainant "expressing some concerns" about Onuh's treatment of him. ROI 70.[8] The Warden did not remember talking to either complainant or Onuh about the issues. ROI 70. The two had "interpersonal communication issues" in the Warden's opinion, and Upton did "not recall ever discussing a discrimination concern" with complainant. ROI 72.

Upton acknowledged that Onuh once disregarded Chaplain Clark's direction to escort volunteers, ROI 69, 71. The warden did not know the volunteers' religion. ROI 71. In general, Upton explained, approved volunteers arrive at the institution throughout the week and a chaplain escorts them to services or to other activities. ROI 71. A chaplain's faith group plays no role in assigning escort duties. ROI 72. In fact, any employee can be tasked with escorting visitors. ROI 71.

### E.    Chaplain Beverly Ford

Protestant Chaplain Beverly Ford recalled a time when Onuh refused to escort volunteers, even after Clark directed him to do so. ROI 95. Onuh told Ford he would not escort the volunteers because he was busy with his own religious activities. ROI 95. Ford escorted the volunteers herself. ROI 95.

Ford believed that at times, some volunteers were not escorted into the prison but she "was not involved in the particulars." ROI 96. She did not know of Onuh calling Protestant ministers "boys" or "liars." ROI 95.[9] Complainant

---

[8]    Upton did not specify the email's date. ROI 70.

[9]    Chaplain Farid Farooqi also testified that he had no knowledge of such insults, and that he did not observe Onuh refusing to escort non-Catholic volunteers. ROI 107. He believed there

11

and Onuh "have had disagreements (issues) on and off," Ford
said. ROI 97. She did not opine on what motivated their
disagreements. There was "a hostile work environment" at times,
but, she maintained, "[i]t's not about religion." ROI 97.

F.    Chaplain Rachel Floyd

Floyd, another Protestant chaplain, worked at Carswell from
2012 until 2014. ROI 101. Onuh showed "disrespect towards
[her] and other Protestant Chaplains," she reported, and
"disregard" for his duties to escort volunteers regardless of
their faith. ROI 103. For example, Floyd saw Onuh refuse to
escort Protestant volunteers and supervise Protestant
activities. ROI 101, 103. In her years there, he "often
refused to escort non-Catholic volunteers." ROI 102. As a
result, Floyd said, every Saturday she worked she was
responsible for escorting volunteers because Onuh "refused to
bring them in." ROI 102. And on Saturdays when she did not
work, volunteers "had to leave the institution" without being
able to participate in the scheduled meeting or activity because
Onuh would not escort them. ROI 102.

In Floyd's view, complainant's job "was often made more
difficult by Chaplain Onuh refusing to supervise other faith
groups and their volunteers." ROI 104. She pointed out by way
of contrast that BOP Program Statement 3939.07 requires
chaplains to "[s]hare pastoral duties, supervision of inmate
groups, and administrative functions equitably." ROI 103.

Floyd said she believed complainant endured discriminatory
treatment and that she "personally witnessed and experienced
Chaplain Onuh's disrespect towards [her]self and other
Protestant [c]haplains." ROI 103. Once, Floyd reported, Onuh
told a female Protestant chaplain "that she was not a chaplain
because she was female." ROI 101.

Floyd also admitted she was "not sure" how much religion
influenced Onuh's mistreatment of coworkers because he "showed
disrespect to most co-workers" and "was rude, disrespectful and

were "personal issues between" complainant and Onuh, rather than
religious issues. ROI 108.

12

overall very hard to work with." ROI 104. As a result, Floyd "avoided" Onuh as much as possible because of his "short temper." ROI 101.

### G.   Mentor Coordinator Kathy Mobley

Mobley said she has spoken to complainant and observed that he seemed "very troubled" by the alleged harassment and felt "at a loss" for what to do. ROI 113. Indeed, complainant has confided in her "several times over the course of the last several years" about potential religious discrimination. ROI 116. In addition, "several inmates," she reported, had told her that Onuh made derogatory comments about Protestant chaplains. ROI 114. However, Mobley did not hear Onuh make such statements. ROI 113.

Mobley has often sought help in correcting Onuh's behavior. For example, she spoke to human resources personnel on three occasions and twice reported him to BOP internal investigators. ROI 116. She communicated problems to union leaders, her supervisor (Clark), and her former supervisor (Danage). ROI 116. "Everyone seems to acknowledge that it is difficult to work with him." ROI 116. In particular, she said, "female inmates find it impossible to please him." ROI 116. But "no one address[es] the fact that his behavior is not acceptable and should not be tolerated in the worksite. . . . So we all just stay clear." ROI 116. Mobley admitted she tries to avoid Onuh. ROI 116. "Letting him do his thing, makes everyone feel less threatened." ROI 116.

As Mobley sees it, Onuh does not escort volunteers "unless he absolutely has no other choice," and this "adds a lot of extra stress on those who work with him . . . who must pick up the extra work load." ROI 114. Ford, for instance, has had to "work comp time" to supervise activities after Onuh refused to. ROI 115. Mobley has also "covered Volunteer Programming because [Onuh] would not escort the Volunteers." ROI 115. She feels obligated "to ensure coverage" because she does not want volunteers "to feel they are not appreciated or valued for th[eir] services." ROI 115. On one occasion she recounted, Onuh and Farooqi were the only two staff working the evening shift and Onuh refused to escort a Protestant group. Farooqi

had to cover for him. ROI 115. By way of explanation, Mobley speculated Onuh might see escorting visitors as "beneath him." ROI 114.

Mobley wondered if Onuh acted because of religion or if he "just is not willing to do anything that he does not absolutely have to do." ROI 114. Onuh, in her observation, "just is not a Team Player and is only willing to do what will serve him or his own needs." ROI 114. He is the only Catholic leader and "has an issue with most everyone in the Department," Mobley confirmed, leaving her "unsure" whether his attitude was based on religion. ROI 115.

## Analysis

Complainant claimed that he was discriminated against because of his Protestant religion when Chaplain Onuh made disparaging remarks about Protestant chaplains, refused to escort Protestant and other non-Catholic volunteers, and declined to supervise Protestant activities — leaving Protestant chaplains like complainant with extra work. ROI 44. Complainant said that he raised these issues repeatedly with BOP senior managers and they took no corrective action. Federal employers may not discriminate against employees based on religion. 42 U.S.C. § 2000e-16; see also 29 C.F.R. § 1614.101. Discrimination can include treating "some people less favorably than others" because of their protected characteristic. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).

Discriminatory actions prohibited by Title VII include "creat[ing] a hostile or abusive work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). A hostile workplace "is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of [one's] employment and create an abusive working environment.'" Harris Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, 477 U.S. at 65, 67).

Antidiscrimination law is not a "general civility code" for employees and does not assuage "the ordinary tribulations of the

workplace, such as the sporadic use of abusive language" and
"occasional teasing." Faragher v. City of Boca Raton, 524 U.S.
775, 788 (1998) (internal quotation marks omitted). Nor are
"trivial harms" or "minor annoyances" actionable. Burlington N.
& Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Instead,
harassing "conduct must be extreme" before it becomes the
subject of legal action. Faragher, 524 U.S. at 788. Incidents
like "slights," "occasional name-calling, rude emails, lost
tempers and workplace disagreements" are "uncognizable" under
federal antidiscrimination law, and Title VII does not provide
relief for "personality conflicts." Baird v. Gotbaum, 792 F.3d
166, 171 (D.C. Cir. 2015) (internal quotation marks omitted).

In determining whether alleged conduct is sufficiently
severe or pervasive to have violated Title VII's prohibition of
a hostile work environment, the fact-finder looks at all the
circumstances. Harris, 510 U.S. at 23. These include the
"frequency of the discriminatory conduct, its severity, whether
it is physically threatening or humiliating, or a mere offensive
utterance, and whether it unreasonably interferes with an
employee's work performance." Flowers v. Southern Reg'l
Physician Servs. Inc., 247 F.3d 229, 236 (5th Cir. 2001). A
series of incidents may amount to a hostile environment if they
are "more than episodic; they must be sufficiently continuous
and concerted in order to be deemed pervasive." Perry v. Ethan
Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (internal
quotation marks omitted).

Importantly, the record "must demonstrate that the conduct
occurred because of" complainant's protected characteristic.
Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

With respect to harassment on the basis of religion, it is
noted at the outset that Title VII does not generally extend to
actions within religious institutions. Hosanna-Tabor
Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 188
(2012). In this case, however, the institution in question is a
federal penal institution and chaplains at the institution are
not exempt from Title VII. Religious animus must not be a
factor in chaplains' treatment of each other or assignment of
their secular duties. As the Seventh Circuit explained in
adjudicating a claim by a Veterans Administration hospital

15

chaplain, a chaplain "is not simply a preacher but a secular employee hired to perform duties for which he has, by dint of his religious calling and pastoral experience, a special aptitude." The court saw "no reason to analyze this case differently from the typical Title VII case," Baz v. Walters, 782 F.2d 701, 705 (7th Cir. 1986). Similarly, in considering a case against the District of Columbia Department of Corrections, another federal judge has remarked that "religious affiliation is, at best, a matter of secondary importance" for prison chaplains, who must serve inmates of all faiths. Rasul v. D.C., 680 F. Supp. 436, 440 (D.D.C. 1988).

An institution may fire a chaplain who "would not conform his ministry" to the institution's "multidisciplinary" and "ecumenical approach." Baz, 782 F.2d at 704, 709. And a preference for chaplains of a particular faith may violate Title VII. Heffernan v. Dep't of Health and Human Serv., EEOC Appeal No. 0320060079, 2007 WL 313336, at *11 (Jan. 24, 2007).

## I.   A Hostile Work Environment

Complainant claimed Chaplain Onuh created a hostile environment motivated by religious bias when he treated complainant harshly, made insulting statements about Protestants, and refused to serve non-Catholic inmates and volunteers. Onuh scheduled Catholic services in the time and place complainant had reserved for Protestant worship, interrupted Protestant worship, and refused to escort non-Catholic volunteers - resulting in cancelled meetings. ROI 60, 66, 119, 147-149, 156. A review of Onuh's behavior leads to the conclusion that his actions were "'sufficiently severe or pervasive to alter the conditions of [complainant's] employment and create an abusive working environment.'" Harris, 510 U.S. at 21 (quoting Meritor Sav. Bank, 477 U.S. at 65, 67). His mistreatment was "more than episodic" as it took place over several years. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997); ROI 62, 127, 129, 136. Sometime before April 2015, complainant told his supervisor about Onuh's derogatory comments and how he, "as a Protestant . . . was being asked to do more than Chaplain Onuh." ROI 62. Complainant reported similar problems in 2017 and 2018. ROI 27, 58, 66, 119, 146.

Others confirmed that Onuh's behavior was pervasive and longstanding. Mobley said complainant confided in her "several times over the course of the last several years" about potential religious discrimination. ROI 116. Floyd, who left Carswell in 2014, said Onuh "often refused to escort non-Catholic volunteers" while she worked there. ROI 102.

Inmates, too, noticed Onuh's religious bias. One prisoner who complained about Onuh's refusal to supervise non-Catholic worship observed this behavior "on several occasions." ROI 149. The pattern here is "sufficiently continuous and concerted in order to be deemed pervasive." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997).

Other harassing incidents include the times when Onuh made derogatory comments about complainant and his Protestant coworkers. He said complainant's Protestant services were "just entertainment," called the Protestant chaplains "boys," said they lied, and told complainant he was "worthless." ROI 59. Onuh also made pejorative generalizations about Protestants, accusing evangelicals like complainant of "ruining the country." ROI 59. Such statements further contribute to a finding that Onuh's conduct was sufficiently pervasive to violate Title VII. The Commission has found similar belittling and humiliating statements about an individual's religion may support a finding of religious harassment. See Hurston v. United States Postal Serv., EEOC Appeal No. 01986458, 2001 WL 65204, at *2 (Jan. 19, 2001) (finding harassment when, among other things, a co-worker characterized an employee's Wiccan observances as "frolic[ing] with the nymphs"); Lashawna C. v. Dep't of Labor, EEOC Appeal No. 0720160020, 2017 WL 664453, at *5-6 (Feb. 10, 2017) (holding manager's single comment to Jewish subordinate that he "work[ed] like a Hebrew slave" constituted harassment). The Commission has also found harassment where, among other things, a manager called an employee's halal food "pagan." Sabir v. Dep't of Health and Human Servs., EEOC Appeal No. 01993859, 2002 WL 31107304, at *5 (Sept. 11, 2002).

Onuh's harassment affected complainant's working conditions. According to complainant, Onuh frequently "yell[ed]," conducted "outbursts and tirade[s]," and "bec[ame] bellicose." ROI 129, 133. At some point, to get away from this

17

behavior, complainant moved out of his office.  ROI 129.  See
<u>Ocheltree v. Scollon Prods., Inc.</u>, 335 F.3d 325, 333 (4th Cir.
2003) (noting harassment was sufficiently severe when it "drove
[plaintiff] from the room" and "surely made it more difficult
for her to do her job").

   Onuh's actions also altered complainant's duties.
Complainant had to pitch in when Onuh refused to serve non-
Catholic inmates and their volunteers.  ROI 115.  As Floyd put
it, Onuh often made complainant's work "more difficult" when he
refused to serve other faith groups.  ROI 104.  Mobley, too,
said that Onuh's disregard for non-Catholics "adds a lot of
extra stress" and "extra work load" for complainant and others.
ROI 114.

   In addition to making extra work, Onuh interfered with
complainant's work by interrupting Protestant services and
scheduling conflicting Catholic services.  ROI 66.  As one
inmate explained, Onuh insisted on keeping an 8:00 a.m. Sunday
slot for mass — telling Catholic inmates to come for mass at 8
even if the chaplaincy scheduled it at other times.  ROI 147-
148.

   Onuh undermined complainant's rapport with inmates and his
authority over them.  He informed prisoners that the Catholic
community was "under attack" and that Protestant chaplains, like
complainant, told them "lies."  ROI 151-153.  Complainant
considered these comments particularly problematic, given his
role in the prison.  His job is to minister to inmates of all
faiths; accordingly, he must seek their trust.  Complainant and
other BOP chaplains are also "Correctional Law enforcement
Officers," and getting inmates "riled up," as Onuh did, is
troubling and perhaps dangerous.  ROI 115, 148.[10]

   Onuh's anti-Protestant attitude further undermined the
Religious Service's Department's mission to provide support for
all faiths.  The department had to change the schedule for

---

[10]  As Mobley explained, Religious Services employees "are [a]ll
Correction Law Enforcement Officers [f]irst" and "[t]hat is why
[they] receive Law Enforcement Pay."  ROI 115.

18

Native American worship because Onuh proved unreliable. ROI 58.
According to a Seventh Day Adventist prisoner, Onuh failed to
show up for non-Catholic group activities several times,
resulting in cancellation. ROI 149. While complainant cannot
sue on behalf of inmates or other employees Onuh injured,
McCollum v. California Dep't of Corr. & Rehab., 647 F.3d 870,
878 (9th Cir. 2011), evidence that Onuh repeatedly refused to
serve non-Catholic inmates helps to show his religious animus
towards complainant, Briscoe v. Fred's Dollar Store, Inc., 24
F.3d 1026, 1028-1029 (8th Cir. 1994) (noting that mistreatment
of black customers helped show "prevailing atmosphere of racial
animus against Blacks in general, and Black employees in
particular").

     There is some evidence of "personality conflicts" with Onuh
that may not implicate religion. In Ford's view, complainant
suffered "a hostile work environment" but complainant's "issues"
with Onuh were "not about religion." ROI 97. Mobley said that
because there were no other Catholic leaders at the prison, she
was "unsure" whether he mistreated others because of their
religion or whether he would mistreat "everyone" equally. ROI
115. Furthermore, some of complainant's complaints to
management about Onuh's "yelling" and other conflicts do not
mention religious discrimination. ROI 128-134; but see 139
(where complainant reported to a Human Resources Manager that
Onuh resists serving non-Catholics).

     When considered as a whole, the record provides significant
evidence that Onuh's actions and hostility had a religious
basis. Evidence of "harassment must be viewed against all of
the circumstances and not in isolation." Jackson v. Quanex
Corp., 191 F.3d 647, 664 (6th Cir. 1999). When considering
motives, Title VII requires that "a protected characteristic was
a motivating factor" but it need not be the only factor. Quigg
v. Thomas Cty. Sch. Dist., 814 F.3d 1227, 1238 (11th Cir. 2016);
Wright v. Murray Guard, Inc., 455 F.3d 702, 717 (6th Cir. 2006).
Here, assessing Onuh's motives in light of all the circumstances
means evaluating Onuh's general disagreeableness alongside his
comments about Protestant chaplains and his pattern of shirking
supervision of non-Catholic services. Even if some of Onuh's
disagreeableness and unwillingness to help fellow chaplains were
due to personal issues, there is ample evidence that Onuh's lack

of caring for and feeling of not being responsible to non-Catholics played a prominent role in many of his actions.

This conclusion is supported by the measured statements of Supervisory Chaplain Clark, who noted that "Onuh sees workplace relationships as Protestants vers[u]s Catholics" because of his "own religious perspective." ROI 91. It was not the case that Onuh merely does not like to work; Clark said he "doesn't like to work with other faith groups." ROI 91. The record bears out Clark's assessment, as it does not describe Onuh's failure to supervise Catholic services or escort Catholic volunteers.[11]

Because chaplains must "share pastoral duties, supervision of inmate groups, and administrative functions," Onuh's refusal to serve non-Catholic inmates inevitably shifted work onto other chaplains, and this took place over a considerable period of time. ROI 61. Ford, for one, has had to work overtime when Onuh refused to serve non-Catholic inmates. ROI 90. And Clark said he would feel justified in bringing his own EEO claim, but fears it would not be taken seriously. ROI 92. Onuh's insults and outbursts regularly brought another chaplain to tears, but it appears BOP did nothing to stop his abuse. ROI 127.

II.   BOP's Liability for Onuh's Behavior

An employer is liable for the harassment if the harasser is a coworker and the employer, after receiving notice of the harassment, is negligent in addressing and attempting to correct the harassment. Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). An "employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment." Vance, 570 U.S. at 446. Onuh is complainant's coworker, not his supervisor, so BOP is liable only if managers "knew or should have known" of the harassment, Jackson, 191 F.3d at 664, and failed to take measures "reasonably calculated to

---

[11]   The record does show that Onuh once treated a Catholic Religious Services Employee, Blackerby, harshly. ROI 152. But this one instance does not prove he is an "equal-opportunity harasser," Holman v. Indiana, 211 F.3d 399, 405 (7th Cir. 2000), nasty to everyone regardless of religion, given that he also made explicit, derogatory statements about Protestants. ROI 59.

end the harassment." EEOC v. Xerxes Corp., 639 F.3d 658, 672
(4th Cir. 2011) (internal quotation marks omitted). An employer
must take "prompt and appropriate remedial action." Huston v.
Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 (3d
Cir. 2009).

Employer liability in this case depends on, among other
things, "the promptness of the employer's investigation when
complaints are made, whether offending employees were counseled
or disciplined for their actions, and whether the employer's
response was actually effective." Xerxes Corp., 639 F.3d at
669. It is not enough that management does something in
response to complaints. It must "commit[] itself to resolving
the allegations." Jackson, 191 F.3d at 665 (holding that a
reprimand and other moderate measures that failed to stop
graffiti and slurs were inadequate).

The record shows that BOP management at the institution
knew about Onuh's harassment. In 2013 and 2014 complainant
talked to former Supervisory Chaplain Danage. ROI 62. See
Destiny H. v. Dep't of the Navy, EEOC Appeal No. 0120130872,
2015 WL 9685599, at *5 (Dec. 10, 2015) (holding agency became
aware of harassment when victim told harasser's supervisor).
Admittedly, complainant listed many grievances in his emails to
Danage — most of them personal — but he also told Danage that
"as a Protestant" he had to do more work than Onuh when Onuh
refused to serve non-Catholics. ROI 62, 88. Moreover,
complainant told Danage about Onuh's accusing evangelicals of
"ruining the country." ROI 61. In addition, he told Danage he
had thought about filing an EEO complaint. ROI 62.
Nevertheless Danage, Onuh's supervisor, did not begin to assess
Onuh's behavior and did not investigate further to learn whether
the harassment was pervasive, and religiously motivated.

Complainant also spoke to others around the same time,
including Human Resources Manager Hawk, Warden Upton, and an
Associate Warden. ROI 127, 139, 132. By telling Warden Upton
that he wanted to file an EEO complaint, complainant certainly
made it clear that he did not see the dispute as a personality
conflict. ROI 62. But managers nevertheless told complainant

21

to "ignore" Onuh and to "manage around" him." ROI 62, 66.[12]
Such a response may have been adequate for a mere personality
conflict, but "[w]hen an employer becomes aware of alleged
harassment" on the basis of a protected factor such as religion,
it has the duty to investigate the charges *promptly* and
*thoroughly*." Mayer v. Dep't of Homeland Security, EEOC Appeal
No. 0120071846, 2009 WL 1441519, at *5 (May 15, 2009) (emphasis
in original). BOP did not take any firm, forceful action to
address and respond to complainant's concerns. Indeed, many of
BOP managers' actions seem to have been motivated by the hope
that continuing problems would disappear on their own or would
be ignored by the other chaplains. While there are surely
religious discussions or disputes among chaplains of different
denominations that would not call for managers' intervention,
here the repeated and longstanding complaints called for some
investigation and corrective action. Onuh's pattern of
disparaging comments, harsh treatment of colleagues, and refusal
to serve non-Catholics goes beyond mere differences of opinion
in matters of faith.

Later, in 2017, managers had an even clearer picture of the
problem. Clark, who succeeded Danage, admitted that he believed
Onah acted inappropriately and with religious animus, so much so
that Clark considered filing his own EEO claim. ROI 91-92. He
told the investigator that, in his view, "Onuh sees workplace
relationships as Protestants vers[u]s Catholics." ROI 91.
Clark said he had "voiced [complainant's] concerns to the
Executive Staff." ROI 91.

Also in 2017, Clark acted on complainant's concerns. He
"had several conversations" with Onuh about his behavior and
"issued verbal reprimands." ROI 90. He told the EEO counselor
on March 28, 2017, that he had explained the problems to his
supervisor. ROI 27. He went so far as to refer Onuh for
investigation. ROI 90. The record does not describe the
investigation, but Onuh admits he "was written up" for failing

---

[12] It is not clear when complainant first spoke to the Warden
and Assistant Warden, but since he said he spoke to them about a
potential EEO complaint "back then," when he spoke to
Supervisory Chaplain Danage, this report was likely before April
2015, when Clark became Supervisory Chaplain. ROI 62, 88.

to escort volunteers. ROI 83, 85. By the time the EEO
counselor spoke with Clark's supervisor, Associate Warden
Catricia Howard, on April 6, 2017, she said that Clark had "made
her aware of the situation" and she "[r]eferred it for
appropriate action." ROI 27.

But these efforts — and it seems only Clark made efforts —
did not succeed. Clark himself expressed dissatisfaction with
the situation. ROI 92. In December 2017, more than six months
after complainant filed his EEO complaint, Clark reported, in
the present tense, that Onuh "doesn't like to work with other
faith groups" and "sees workplace relationships as Protestants
vers[u]s Catholics." ROI 23, 37, 91. It does not appear, from
his testimony, that Clark regards Onuh's behavior as reformed.
Indeed, Clark went on to say that he had considered filing an
EEO complaint "and may still." ROI 92.[13]

The record does not show that managers took any additional
action in light of Onuh's incorrigible behavior. Onuh continued
to avoid escorting non-Catholic volunteers and to interfere with
Protestant programming. In March 2018 he left the main facility
so that he would not have to assist a Christian Science
volunteer and that same month he announced and scheduled
Catholic services in the time and space assigned to complainant.
ROI 66. Complainant maintained that "in the year since [his]
official complaint, [he] has seen no change in Chaplain Onuh's
behavior." ROI 66.[14]

_____

[13] Clark's belated efforts would not likely relieve the BOP of
responsibility, even had they stopped Onuh's behavior. "The
Agency may not remove the effect of this initial inaction, i.e.,
avoiding liability, by its subsequent actions." Complainant v.
Dep't of Veterans Affairs, EEOC Appeal No. 0120123232, 2015 WL
3484775, at *4 (May 21, 2015).

[14] While only complainant's harms are directly relevant in this
case, it is worth noting here that Onuh's intolerance of non-
Catholics and managers' inaction affected many others. Inmates
and volunteers also suffered. One group of Seventh Day
Adventists found that Onuh closed the Religious Services area
rather than facilitate their services, and reported that this
happened "on several occasions." ROI 149. Because Onuh "could

## Decision

The record supports a claim of harassment based on religion.

## Remedies

The following relief is ordered:

1.   BOP shall take immediate steps to remedy the harassment and take steps reasonably calculated to prevent future harassment, consistent with 29 C.F.R. § 1614.501 (a)(2).

Such preventive and corrective action by BOP will include providing EEO training, particularly training on harassment, for Chaplain William Onuh.  In addition, BOP will provide training on harassment and on the supervisory obligation to timely address and report complaints of harassment for Supervisory Chaplain Jonathan Clark, Warden Jody Upton, Associate Warden Catricia Howard, and any other officials in complainant's chain of command at the Carswell, Texas facility that the BOP EEO Office determines need such training.

2.   Complainant is eligible for compensatory damages recoverable under Section 102 (a) of the Civil Rights Act of 1991.  This award is to be calculated based on complainant's proffer of evidence as to the harm suffered, the extent, nature and severity of the harm, and the duration of the harm caused as a result of BOP officials failure to remedy a hostile work environment based on religion.

---

not be relied upon" to serve the Native American worship group, the chaplains had to change their scheduled services.  ROI 58. Given that BOP has a constitutional and statutory duty to permit each inmate to practice his or her religion, Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir. 2008); 42 U.S.C. § 2000bb-1(a), it is particularly troubling that managers here have long ignored Onuh's refusal to serve non-Catholics.

24

Complainant shall submit his request for compensatory damages
and supporting documents, including medical documentation, if
any, of injuries suffered as a result of the religious
harassment, to Carolyn Sapla, Acting EEO Officer, Federal Bureau
of Prisons, 320 First Street, N.W., Room 936, Washington, DC
20534.  A copy of the request should be submitted to the
Complaint Adjudication Office as well.  Following its receipt of
the compensatory damages request, BOP should either award the
amount requested or determine what amount it considers an
appropriate award.  BOP and complainant should then attempt to
agree on the compensatory damages award.  If a mutually
acceptable amount cannot be agreed upon, the parties should
notify the Complaint Adjudication Office, which will then issue
a decision determining an appropriate award.

3.    Complainant is statutorily entitled to reasonable
attorney's fees incurred pursuant to her successful hostile work
environment claim.  29 C.F.R. § 1614.501(e).  If complainant's
attorney is eligible for an award of attorney's fees, then
within thirty days of receipt of this decision, complainant's
attorney shall submit a verified statement of costs and an
affidavit itemizing the attorney's fees to Carolyn Sapla, Acting
EEO Officer, Federal Bureau of Prisons, 320 First Street, N.W.,
Room 936, Washington, DC 20534.  A copy of this statement should
be sent to the Complaint Adjudication Office as well.  29 C.F.R.
§1614.501(e)(2).

     If a mutually acceptable figure for the attorney's fees
cannot be agreed upon, the parties should notify the Complaint
Adjudication Office, which will then determine an appropriate
award.  29 C.F.R. §1614.501(e)(2)(ii)(A).

4.    BOP shall post a notice for sixty days within the BOP
Carswell, Texas facility, consistent with 29 C.F.R. § 1614.501
(a)(1).

5.    BOP shall submit a report on the status of the
implementation of the relief ordered in this case to the

Complaint Adjudication Office within ninety days of this decision.

_____
Robert K. Abraham
Acting Complaint Adjudication Officer

_____
April J. Anderson
Complaint Adjudication Office

26

U.S. Department of Justice

Complaint Adjudication Office

Agency No. BOP-2017-0505
DJ No.     187-3-4582

*950 Pennsylvania Ave, NW*
*RFK Building, Room 3651*
*Washington, DC 20530*

Mr. Casey Campbell
13109 Berrywood Trail
Fort Worth, Texas 76244

**SEP 2 7 2019**

Dear Mr. Campbell:

This is in reference to the matter of compensatory damages
and attorney's fees in your complaint of discrimination that you
filed against the Federal Bureau of Prisons.  Under the
Department of Justice's equal employment opportunity
regulations, the Complaint Adjudication Officer renders the
final Department of Justice decision in this matter.  Enclosed
is the final Department of Justice decision encompassing damages
and fees.

### Rights of Appeal

You have the right to appeal any part of this decision to
the Equal Employment Opportunity Commission.  You may do so by
filing your appeal within 30 days of the date you receive this
decision.  If you are represented by an attorney of record, the
30-day appeal period shall begin to run the day your attorney
receives this decision.  The appeal must be in writing.  The
Commission prefers that you use EEOC Form 573, Notice of
Appeal/Petition, a copy of which is attached, to appeal this
decision.  The notice of appeal should be sent to the Director,
Office of Federal Operations, EEOC, Post Office Box 77960,
Washington, D.C. 20013, by mail, personal delivery, or
facsimile.  The fax number for the Office of Federal Operations
is (202)663-7022.  You must also send a copy of your notice of
appeal to Carolyn Sapla, Acting EEO Officer, Bureau of Prisons,
320 First Street, N.W., Room 936, Washington, D.C.  20530.  You
must state the date and method by which you sent the copy of
your notice to the agency's EEO Director either on, or attached
to, the notice of appeal you mail to the EEOC.  Alternatively,
you may file your appeal online by using the EEOC Public Portal
at eeoc.gov.

Second, you have the right to file a civil action in the
appropriate United States District Court within 90 days of the
date you receive this decision.  In filing your federal

complaint, you should name Attorney General William P. Barr as the defendant. Even if you appeal this decision to the EEOC, you still have the right to go to federal court. You may file a civil action in the United States District Court within 90 days of the day you receive the Commission's final decision on your appeal, or after 180 days from the date you filed your appeal with the Commission, if the Commission has not made a final decision by that time.

If you cannot afford to file a civil action, you can ask the court to allow you to file the action at no cost to you. The court may also provide you with an attorney if you cannot afford to hire one to represent you in your civil action. Questions concerning when and how to file a waiver of costs should be directed to your attorney or the District Court clerk.

Sincerely,

Robert. K. Abraham
Acting Complaint Adjudication Officer

cc:  William J. Dunleavy
     Timothy F. Maughan
     Carolyn Sapla
     Richard Toscano

*The U.S. Equal Employment Opportunity Commission*

## NOTICE OF APPEAL/PETITION
## TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

OFFICE OF FEDERAL OPERATIONS
P.O. Box 77960
Washington, DC 20013

**Complainant Information:** (Please Print or Type)

| | |
|---|---|
| Complainant's name (Last, First, M.I.): | |
| Home/mailing address: | |
| City, State, ZIP Code: | |
| Daytime Telephone # (with area code): | |
| E-mail address (if any): | |

**Attorney/Representative Information (if any):**

| | |
|---|---|
| Attorney name: | |
| Non-Attorney Representative name: | |
| Address: | |
| City, State, ZIP Code: | |
| Telephone number (if applicable): | |
| E-mail address (if any): | |

**General Information:**

| | |
|---|---|
| Name of the agency being charged with discrimination: | |
| Identify the Agency's complaint number: | |
| Location of the duty station or local facility in which the complaint arose: | |
| Has a **final action** been taken by the agency, an Arbitrator, FLRA, or MSPB on this complaint? | _____Yes; Date Received _____(Remember to attach a copy)<br>_____No<br>_____This appeal alleges a breach of settlement agreement |
| Has a complaint been filed on this same matter with the EEOC, another agency, or through any other administrative or collective bargaining procedures? | _____No<br>_____Yes (Indicate the agency or procedure, complaint/docket number, and attach a copy, if appropriate) |
| Has a civil action (lawsuit) been filed in connection with this complaint? | _____No<br>_____Yes **(Attach a copy of the civil action filed)** |

**NOTICE**: Please **attach a copy of the final decision or order** from which you are appealing. If a hearing was requested, please attach a copy of the agency's final order and a copy of the EEOC Administrative Judge's decision. Any comments or brief in support of this appeal MUST be filed with the EEOC **and** with the agency **within 30 days** of the date this appeal is filed. The date the appeal is filed is the date on which it is postmarked, hand delivered, or faxed to the EEOC at the address above.

| Signature of complainant or complainant's representative: | |
|---|---|
| Date: | |

**EEOC Form 573 REV 1/01**

## PRIVACY ACT STATEMENT

(This form is covered by the Privacy Act of 1974. Public Law 93-597. Authority for requesting the personal data and the use thereof are given below.)

1. **FORM NUMBER/TITLE/DATE**: EEOC Form 573, Notice of Appeal/Petition, January 2001

2. **AUTHORITY**: 42 U.S.C. § 2000e-16

3. **PRINCIPAL PURPOSE**: The purpose of this questionnaire is to solicit information to enable the Commission to properly and efficiently adjudicate appeals filed by Federal employees, former Federal employees, and applicants for Federal employment.

4. **ROUTINE USES**: Information provided on this form will be used by Commission employees to determine: (a) the appropriate agency from which to request relevant files; (b) whether the appeal is timely; (c) whether the Commission has jurisdiction over the issue(s) raised in the appeal, and (d) generally, to assist the Commission in properly processing and deciding appeals. Decisions of the Commission are final administrative decisions, and, as such, are available to the public under the provisions of the Freedom of Information Act. Some information may also be used in depersonalized form as a data base for statistical purposes.

5. **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION**: Since your appeal is a voluntary action, you are not required to provide any personal information in connection with it. However, failure to supply the Commission with the requested information could hinder timely processing of your case, or even result in the rejection or dismissal of your appeal.

Send your appeal to:

The Equal Employment Opportunity Commission
Office of Federal Operations
P.O. Box 77960
Washington, D.C. 20013

*This page was last modified on January 9, 2009.*

Complaint Adjudication Office

Agency No.   BOP-2017-0505
DJ No.       187-3-4582

*950 Pennsylvania Avenue NW*
*RFK Building, Room 3651*
*Washington, DC 20530*

DEPARTMENT OF JUSTICE FINAL DECISION          **SEP 2 7 2019**

in the matter of

Compensatory Damages and Attorney's Fees

in the case of

<u>Casey Campbell v. Federal Bureau of Prisons</u>

On May 16, 2019, the Complaint Adjudication Office issued a
Department of Justice Final Decision finding that Federal Bureau
of Prisons (BOP) management violated Title VII when it failed to
address religious harassment complainant suffered from a
coworker, Chaplain William Onuh. <u>Casey Campbell v. Federal
Bureau of Prisons</u>, BOP-2017-0505 (hereinafter FAD). As the
prevailing party, complainant is entitled to compensatory
damages for any demonstrable harm suffered as a result of
management's violation of Title VII. FAD at 24-25. As the FAD
explained, damages are based on "complainant's proffer of
evidence as to the harm suffered, the extent, nature and
severity of the harm, and the duration of the harm caused." <u>Id</u>.
at 24.

The FAD ordered complainant to submit any request for
compensatory damages to BOP's EEO Office and ordered BOP to
either award the damages complainant requested or attempt to
negotiate an appropriate amount; if a mutually acceptable award
could not be agreed upon, the FAD requested the parties to
notify this Office so that it could issue a decision. FAD at
24-25.

On July 12, 2019, the parties notified this Office that
they had not reached an agreement on damages.

### Background

Complainant and Onuh work together as prison chaplains at
the BOP's Federal Medical Center Carswell in Fort Worth, Texas.

Over the course of several years, Chaplain Onuh treated
complainant harshly, by making insulting statements about
Protestants, interfering with his work, and refusing to assist
at non-Catholic functions even though such assistance was
expected of all Chaplains, regardless of faith.  Onuh scheduled
Catholic services in the time and place complainant had reserved
for Protestant worship services, interrupted Protestant worship
services, and refused to escort non-Catholic volunteers within
the institution – resulting in cancelled meetings or other
chaplains needing to cover for Onuh's refusal.  FAD 5, 16.  Onuh
also disparaged Protestant chaplains during services he led, and
complainant felt "ridiculed . . . [by Onuh] in a public
setting."  Id. at 2-3.  Complainant provided evidence that Onuh
routinely "yell[ed]" at complainant, becoming "bellicose."  FAD
2; ROI 129.  Eventually, because of the ongoing harassment and
difficulties at work, complainant moved out of the office he
shared with Onuh into a supply closet/temporary office in order
to escape Onuh.  Ibid.

Starting in 2013, complainant told managers about his
troubles with Onuh, including the derogatory comments and the
fact that because of Onuh's refusal to perform certain tasks,
other chaplains had to do more work than Onuh.  FAD 6-7, 16.
Managers did little to address the problems despite repeated
complaints by complainant, and their reprimand of Onuh did not
stop his conduct or behavior.  Id. at 22-23.  At one point, when
Onuh persisted with his conduct, managers suggested that
complainant ignore Onuh's conduct.  Id. at 21-22.  Harassment
continued, and on May 5, 2017, complainant filed an EEO
complaint alleging "a long-standing and unresolved problem" with
Onuh.  ROI 23.

## Facts

In support of their respective position on damages,
complainant and BOP submitted documents they had exchanged
during their negotiations on damages and fees.  These documents
as well as the original Record of Investigation provide the
basis for this Final Decision on damages and fees.

In his June 28, 2019, settlement offer to BOP, complainant
claimed that he should be compensated "in a manner analogous to

2

the Bureau of Prisons' 'retention pay' scheme." June 28, 2019, letter to Carolyn V. Sapla at 2. Under this program, BOP pays certain employees up to 25% above the regular pay rate for hard-to-fill positions. Id. Exh. A. Alternatively, complainant suggested he be compensated based on the BOP's "special rate pay," which affords up to a 30% pay increase for positions in selected regions of the country or with certain skills. Id. Exh. B. Complainant reasoned that these rates of pay reflect difficult work environments, and that, given Onuh's discrimination, he similarly endured a difficult work environment. Based on an average between "retention pay" and "special rate pay," complainant requested $152,647.28.[1]

In addition, complainant said that he used more sick leave and annual leave because of the hostile work environment he endured. He claimed that he took leave in response to the "mental anguish and emotional distress" he suffered. Before Onuh joined the facility, complainant used an average of 51 hours of sick leave per year. After Onuh's arrival, complainant noted, he used twice as much sick leave. June 28, 2019, letter to Carolyn V. Sapla at 2-3. Furthermore, complainant claimed, he used an extra 60 hours of annual leave each year "to remove himself from the hostile environment." Id. at 3. He requested $16,671.60 in compensation, the value of the extra leave he used. Id. at 3.

Complainant also claimed that BOP improperly failed to promote him in 2015 and instead promoted a less qualified colleague. He did not detail how the non-promotion is related to his hostile work environment claim. He sought lost wages because the promotion would have increased his salary. June 28, 2019, letter to Carolyn V. Sapla at 3.

Lastly, complainant asked for an additional sum covering "non-economic damages for mental anguish and emotional distress he has suffered." He alleged that these damages are equal to

---

[1] It is not clear whether this amount was intended by complainant to represent pecuniary damages for monetary losses or compensatory damages for pain and suffering. Given that complainant made an additional demand, later in his letter, for "non-economic damages for mental anguish and emotional distress" of $194,925.74, it appears that the claim for retention/special rate pay damages is for pecuniary damages.

3

the lost wages, leave expended, and hardship pay he previously
described, and amount to a further $194,925.74. Complainant's
total damages claim comes to $389,851.48, with an additional
attorney's fees request of $4,900.00. June 28, 2019, letter to
Carolyn V. Sapla at 4. Complainant did not itemize or otherwise
explain his attorney's fee request.

Complainant separately sought injunctive relief. He
requested that Onuh "be removed from his assignment" at BOP
"through termination, resignation, or reassignment." He also
asked that one of his supervisors be reprimanded for how she
handled his complaint, that BOP send the FAD to Onuh's church
authorities, and that BOP reevaluate its hiring policies for
chaplains. Referencing his nonpromotion, complainant requested
that he be advanced to a GS-13 pay grade and placed on
administrative leave until BOP removes Onuh. June 28, 2019,
letter to Carolyn V. Sapla at 4.

On July 11, 2019, BOP rejected complainant's proposal. BOP
characterized complainant's retention/special rate pay as
impermissible "back pay" and concluded that he had not shown he
was entitled to such compensation. July 11, 2019, letter to
William Dunleavy at 1, 4. In considering his lost leave claim,
BOP pointed out that complainant proffered no specific evidence
to substantiate his use of sick or annual leave, other than
"bald assertion of his counsel." Id. at 3-4. BOP also rejected
his request for promotion, stating that the FAD contained no
findings or evidence on that issue. Id. at 4.

In addressing complainant's alleged emotional pain and
suffering, BOP noted that complainant had not submitted any
statements from family members, friends, or health care
providers. A review of complainant's submissions indicates that
he did not submit any other proof in support of his emotional
damages claim. July 11, 2019, letter to William Dunleavy at 5-
6.

BOP also rejected complainant's claims for injunctive
relief, stating that the requests did not fall within the relief
provided in the FAD and that "most are prohibited by law or
policy." July 11, 2019, letter to William Dunleavy at 6-7.

4

On the issue of attorney's fees, BOP noted that complainant
did not submit a request within 30 days, as specified in the
FAD.  Furthermore, BOP maintained that complainant submitted no
affidavit or other records to itemize the fees or describe
counsel's expertise.  July 11, 2019, letter to William Dunleavy
at 7.

Citing the "duration and severity of [Onuh's] conduct," the
lack of supporting evidence, and comparisons to similar cases,
BOP offered an award of 100 hours of sick leave, 100 hours of
annual leave, $7,500 in non-pecuniary damages, and $1,000 in
attorney's fees.  July 11, 2019, letter to William Dunleavy at
8-9.

In response, on July 12, complainant submitted a reduced
demand for $166,524.30 in compensatory damages, reinstatement of
306 hours of sick leave and 360 hours of annual leave, and
attorney's fees of $5,950.  July 12, 2019, letter to Timothy
Maughan at 4.  Complainant's counsel stated that the original
Record of Investigation "eliminates any need . . . to send . . .
more evidence" of complainant's injuries.  Id. at 1.
Complainant's counsel also submitted an affidavit on attorney's
fees, outlining his experience, his hourly rate, and the time
spent on complainant's case.  Declaration of William J.
Dunleavy.  He reported that complainant retained him on May 25,
2019.

## Analysis

As appropriate relief, complainant is requesting
$166,524.30 in compensatory damages, reinstatement of 306 hours
of sick leave and 360 hours of annual leave, and attorney's fees
of $5,950.  July 12, 2019, letter to Timothy Maughan at 4.  BOP
has offered 100 hours of sick leave, 100 hours of annual leave,
$7,500 in non-pecuniary damages, and $1,000 in attorney's fees.
July 11, 2019, letter to William Dunleavy at 8-9.

### A.   Compensatory Damages

Compensatory damages may be awarded for pecuniary losses,
such as medical expenses, and non-pecuniary losses, such as
"emotional pain, suffering, inconvenience, mental anguish, and

5

loss of enjoyment of life" caused by management's violation of Title VII.  EEOC Enforcement Guidance: Compensatory and Punitive Damages Available Under § 102 of the Civil Rights Act Of 1991, 1992 WL 189089, at *5 (hereinafter "EEOC Enforcement Guide"); 29 C.F.R. § 1614.501; Welker v. Dep't of Agric., EEOC DOC 0120120330, 2012 WL 3144521, at *7 (July 27, 2012).  Damages are meant to compensate the employee for actual damage, not to punish the employer for wrongdoing.  Complainant v. Dep't of Justice, EEOC Appeal No. 0120123467, 2015 WL 1607780, at *18 (Apr. 3, 2015).  Complainant bears the burden of providing sufficient relevant evidence to support damages.  St. Louis v. Dep't of Agriculture, EEOC Appeal No. 01A24586, 2003 WL 22988987, at *3 (Dec. 12, 2003).  For both sets of compensatory damages, complainant must show that "the agency's discriminatory conduct directly or proximately caused the losses."  Complainant, EEOC Appeal No. 0120123467, 2015 WL 1607780, at *20.

## B.   Pecuniary Losses

Complainant initially made a claim for pecuniary damages in the amount of $194,25.74.  Pecuniary losses are "quantifiable," "out-of-pocket expenses" such as "moving expenses, medical exp[e]nses, psychiatric expenses, [or] physical therapy expenses."  St. Louis, EEOC Appeal No. 01A24586, 2003 WL 22988987, at *2.  A complainant may show them with "receipts, records, bills, . . . confirmation by other individuals, or other proof of actual losses and expenses."  EEOC Enforcement Guide at *4.  While documentation is not, strictly speaking, necessary to establish pecuniary damages, such damages "will not normally be sought without documentation," and a lack of documentation can lower the amount awarded.  Ibid.

Complainant based his claim for pecuniary damages on BOP retention/special rate pay, the value of lost leave, and lost wages from nonpromotion.  June 28, 2019, letter to Carolyn V. Sapla at 1-3.  As noted, complainant appeared to claim economic damages based on a retention/special rate pay analogy.  BOP offers these pay rates to recruit and retain workers in remote geographical areas, in highly competitive locations, or under dangerous conditions.  See June 28, 2019, letter to Carolyn V. Sapla Exhs. A & B.  Complainant does not show, nor could he,

6

that he was entitled to retention pay or special rate pay when
he did not work under such conditions and given that these pay
rates are not part of his employment arrangements with BOP.  The
fact that he endured a difficult work environment does not
warrant pecuniary damages compensation at a pay scale clearly
intended to be applied in very different circumstances.
Pecuniary damages for discrimination are limited to
quantifiable, "out-of-pocket expenses" that, where appropriate,
will be based on the employee's actual payscale.  Complainant,
EEOC Appeal No. 0120123467, 2015 WL 1607780, at *18.

     Further weakening complainant's pecuniary damages claim is
complainant's basing the claim on emotional harm and mental
anguish he suffered at work.  Claims based on such
mental/emotional elements are compensable — but as non-pecuniary
damages, not as pecuniary damages.  Thus, for all these reasons,
complainant's claim for pecuniary damages in the form of wage
compensation at the retention/special rate pay is denied.

     Complainant also made a claim for compensatory damages for
lost leave, leave that he took because of the harassment for
which he requests monetary compensation.  As a starting point,
compensation for leave used because of discrimination is
generally not a matter of pecuniary damages but rather one of
equitable remedies.  Therefore, this topic will be discussed in
the section on equitable remedies.

     Complainant also claims entitlement to lost wages of
$11,436 because BOP did not promote him in 2015.  June 28, 2019,
letter to Carolyn V. Sapla at 3.  Complainant did not allege
discriminatory nonselection in his complaint and the FAD made no
findings on the issue.  For these reasons, complainant is not
entitled to lost wages on this theory.[2]

C.   Non-Pecuniary Damages

     Complainant made a claim for non-pecuniary damages in the
amount of $194,925.74.  Non-pecuniary damages are damages for

---

[2] Complainant also claims that BOP has retaliated against him for complaining
about Onuh.  June 28, 2019, letter to Carolyn V. Sapla at 1.  This claim was
not part of the original investigation or FAD.  See ROI 29, 44.  If
complainant wishes to pursue this claim, he must file a new complaint.

mental and emotional harm and suffering and can include "injury
to professional standing, injury to character and reputation,
injury to credit standing, [and] loss of health." EEOC
Enforcement Guide at *5. But "[e]motional harm will not be
presumed simply because the complaining party is a victim of
discrimination." Id. at *5. A complainant must prove the
"existence, nature, and severity of the emotional harm" he
claims. Ibid. Evidence may take the form of statements from
complainant or others addressing "the outward manifestations or
physical consequences of emotional distress." St. Louis, EEOC
Appeal No. 01A24586, 2003 WL 22988987, at *2. Witnesses can be
"family members, friends, health care providers, and other
counselors (including clergy)" who may describe complainant's
"sleeplessness, anxiety, stress, depression, marital strain,
humiliation, emotional distress, loss of self-esteem, excessive
fatigue, or a nervous breakdown." Ricardo K. v. Dep't of
Justice, EEOC Appeal No. 0720170030, 2017 WL 4784862, at *4
(Oct. 12, 2017).

No specific type of evidence is necessary. "The absence of
supporting evidence, however, may affect the amount of damages"
awarded. Ricardo K., EEOC Appeal No. 0720170030, 2017 WL
4784862, at *4. "The more inherently degrading or humiliating
the defendant's action is, the more reasonable it is to infer
that a person would suffer humiliation or distress from that
action." Ibid.

Here, complainant claims "non-economic damages for [the]
mental anguish and emotional distress he has suffered." June
28, 2019, letter to Carolyn V. Sapla at 3. Complainant's
damages request does not describe his emotional distress or
mental anguish in any detail. He also provides no statements or
other documentation supporting his claim for emotional damages.
Given the absence of affidavits from complainant or others on
damages, the Department of Justice has relied on the
descriptions of complainant's stress, frustration, and anger
that appear in the Record of Investigation, along with a common
sense understanding of what one can "infer that a person would
suffer" under such circumstances. Ricardo K., EEOC Appeal No.
0720170030, 2017 WL 4784862, at *4. Complainant's estimate that
his noneconomic damages equal his economic damages is of little
help because he does not explain how the two are related.

8

The Record of Investigation and the FAD give some evidence
of complainant's harm. Onuh made insulting statements about
Protestants, yelled at complainant, argued constantly, and
disrupted his work. FAD 1-2; ROI 59, 129, 130, 136. Onuh told
complainant that evangelicals "are ruining the country" and
called complainant "worthless." FAD 2; ROI 59. He accused
complainant of shirking work. FAD 2; ROI 138. Complainant
reported that Onuh made staff meetings "almost unbearable." FAD
2; ROI 136. He described Onuh as "bigoted" and prone to
"outbursts and tirade[s]." ROI 23. On June 18, 2014,
complainant felt "sick to [his] stomach and left work early"
after he went to work and unexpectedly encountered Onuh. ROI
134. Complainant took leave, moved into a supply closet, and
rearranged his schedule to avoid Onuh. ROI 129. He asked
managers not to assign him to work alone with Onuh. ROI 132.

Others said the two had a "strained" or "tense" working
relationship. FAD 9; ROI 91, 103. According to one observer,
however, "[a]t times it could be labeled a hostile work
environment and at other times they seem to get along fine."
ROI 97.

Complainant generally had to take on extra tasks and
schedule chaplaincy functions around Onuh, because Onuh refused
to serve at non-Catholic functions. FAD 3, 5, 16; ROI 60-61,
66. As one coworker put it, complainant's "job was often made
more difficult by Chaplain Onuh refusing to supervise other
faith groups and their volunteers." ROI 104.

Complainant suffered particular distress after Onuh
disparaged Protestant chaplains to inmates during the Catholic
mass, and complainant felt "ridiculed . . . in a public
setting." FAD 2; ROI 58, 61, 146-153. When his complaints
about Onuh went unheeded, complainant presumably felt abandoned
by prison leadership as he reported they did not "take [his]
concerns seriously." FAD 7; ROI 132. After Onuh sowed discord
among inmates, complainant worried that Onuh may have "put . . .
staff at risk." FAD 3; Complainant's May 12, 2018, Statement to
the Complaint Adjudication Office at 8-9. All in all,
complainant reported "an atmosphere of anxiety in [his]
department," caused by Onuh. ROI 80.

Onuh's behavior can be described as disrespectful, hurtful, and aggravating, but not threatening or violent. Compensation for harassment by Onuh, which lasted for almost 6 years, also takes into account BOP management's drawn out and mostly ineffective attempts to stop the harassment.

The specific evidence in the record that arguably supports a claim of emotional damages is very limited. There is very little evidence showing that the stress of harassment affected complainant's health — beyond the one day when he reported feeling sick to his stomach. See Elvera S. v. United States Postal Serv., EEOC Appeal No. 0120141452, 2016 WL 930031, at *4 (Feb. 23, 2016) (reporting complainant experienced chest pains, panic attacks, and sleeplessness). There is very little information addressing whether complainant's anxiety persisted at home or affected his personal relationships. See Ibid. (noting complainant testified she "was emotional, depressed, [and had] a lack of interest in things she used to enjoy with [her] family); Campbell v. Dep't of Justice, EEOC Appeal No. 01A40538, 2005 WL 2331821, at *3 (Sept. 14, 2005) (pointing to complainant's husband's account of "stress on [their] relationship").

Non-pecuniary harms cannot be precisely quantified. Adjudicators consider "similar cases, the severity of the harm and duration of the harm." Shirley Marker v. United States Postal Serv., EEOC DOC 01A33910, 2004 WL 1494246, at *3 (June 16, 2004). While "there are no definitive rules governing the amounts to be awarded," the amount should be consistent with awards in similar cases and should not be "monstrously excessive" or the product of passion or prejudice. EEOC Enforcement Guide at 7-8; Complainant, EEOC Appeal No. 0120123467, 2015 WL 1607780, at *18 (internal quotation marks omitted).

Given the limited evidence here, complainant is entitled to $15,000 in non-pecuniary damages for emotional harm and mental anguish. This award is not monstrously excessive and is consistent with EEO precedent. See Marker, EEOC Appeal No. 01A33910, 2004 WL 1494246, at *3 (raising agency's award of $3,500 to $12,000 for emotional harm from 4 years of disability

10

harassment including taunts, ridicule, gossip, additional work, and physical threats); Grice v. Dep't of Agriculture, EEOC Appeal No. 01976646, 2000 WL 270479, at *5 (Feb. 28, 2000) (awarding $11,000 after "complainant was subjected to the deliberate scrutiny of a supervisor motivated by discriminatory animus for a relatively long period of time" and "such a situation would cause emotional trauma"); Hyde v. Dep't of Homeland Sec., EEOC Appeal No. 0720110003 (Jan. 6, 2012) (affirming award of $7,000 in non-pecuniary damages for failure to accommodate employee's religious need to have Sundays as a day off, causing mental anguish and diminished spiritual relationship with fellow worshippers); White v. Dep't of Defense, EEOC Appeal No. 0120103295 (Feb. 27, 2012) (raising the agency's award of $5,000 to $25,000 in case in which management's decisions prevented employee from participating in Sunday worship for 13 months, causing "a great deal of emotional stress," as evidenced by testimony from employee and her doctor, pastor, and beautician, that management's actions caused her to resign from several church leadership positions, develop sleep difficulties, suffer worsened hypertension, and lose her hair).

These cases, along with the limited supporting evidence provided by complainant, as well as the facts provided in the record of investigation, support an award of $15,000 for the emotional harm and stress complainant suffered at work.

D.   Equitable Relief

Complainant claims that because of harassment by Onuh, he took sick and annual leave he ordinarily would not have taken, and he how requests replacement of such leave.  Specifically, complainant claims that he used, on average, 51 more hours of sick leave after the harassment began and that he took 60 more hours of annual leave yearly to escape harassment.  Accordingly, complainant claims he lost a total of 306 hours of sick leave and 360 of annual leave, for which he requests monetary compensation.  Appropriate compensation for equitable damages must place complainant in the same "place" he would have been absent the discrimination.  In other words, for any leave used because of harassment the appropriate remedy would be to reinstate all the leave that complainant used as a result of the discrimination.

11

With respect to complainant's leave claim, while it makes sense that a hostile work environment would increase complainant's leave use, he does not explain with any specificity what amount of leave he used to escape harassment, versus what amount he used for vacations, medical appointments, or family matters. Complainant asserts, without providing any support, that all the increased sick leave usage was because of discrimination. But this assertion is a fairly broad and generalized one and cannot be accepted at face value without some supporting evidence.

But significantly, complainant does not describe the circumstances leading to use of leave and does not describe any treatment or provide medical records or bills that would suggest the leave was used due to ongoing harassment.

Without any such supporting evidence, the Department of Justice cannot verify complainant's claim that he used 111 hours of extra leave annually due to harassment for which he should receive equitable compensation. At the same time, it is clear from the record that complainant was affected by the harassment. Under the circumstances, it is reasonable to conclude that some of the leave he took was due to the harassment. Given the generalized and unspecific nature of the information complainant provided to support his leave claim, a 50% reduction in the total leave requested by complainant is warranted. While this is an estimate, it is one based on an understanding of what transpired at work, the harassment that complainant had to endure, and the rather extended failure of BOP management to address and resolve complainant's harassment concerns. As such, complainant shall have 153 hours of sick leave and 180 hours of annual leave restored.

Complainant asks BOP to take other measures, including removing Onuh. This Office does not function as a "super personnel department[]" dictating discipline and no such action is required here. Meuser v. Fed. Express Corp., 564 F.3d 507, 519 (1st Cir. 2009) (internal quotation marks omitted). BOP must take all reasonable action to stop ongoing harassment and reasonably ensure that the harassment will not recur.

12

Complainant also requests that BOP reprimand one of his supervisors, contact Onuh's religious leaders, promote complainant, put him on administrative leave, and reevaluate chaplain hiring policies. June 28, 2019, letter to Carolyn V. Sapla at 4. None of these measures is required to make complainant whole, and most of these requests are not consistent with the dictates and requirements of Title VII.

E.    Attorney's Fees

As noted above, complainant's claim for damages is hampered by the lack of specific evidence of how Onuh's actions harmed complainant. While complainant's counsel reviewed the record and the FAD and negotiated with BOP over a proposed settlement, he did not prepare any affidavits or compile documentary evidence (such as leave records or medical records) to support complainant's damages claim. The only attorney work product in the record is the June 29 letter to Carolyn Sapla, a follow-up letter to Timothy Maughan, and some brief responses to requests for additional information. Accordingly, an appropriate attorney's fee award is the one BOP offered, $1,000.[3]

## Decision

To compensate complainant for the losses he suffered as a result of harassment, complainant shall have restored to him 153 hours of sick leave and 180 hours of annual leave. He shall

---

[3] BOP pointed out that counsel did not comply with the May 16, 2019, FAD's request that complainant submit his attorney's fees request within 30 days. It should be noted, however, that complainant retained present counsel on May 25, 2019, and at least some of his work presumably took place after the 30-day period. See Declaration of William J. Dunleavy at 2. The delay does not warrant withholding a few award.

13

also be awarded $15,000 in non-pecuniary damages, and $1,000 in
attorney's fees.


Robert K. Abraham
Acting Complaint Adjudication Officer


April J. Anderson
Complaint Adjudication Office